**UNITED STATES of America**

v.

**Belmont KERESTY, Appellant in No. 72–1002.**

**Appeal of Thomas Earl PHILLIPS, in No. 72–1001.**

**Nos. 72–1001, 72–1002.**

United States Court of Appeals, Third Circuit.

Argued March 24, 1972.

Decided July 12, 1972.

Certiorari Denied Nov. 6, 1972. See 93 S.Ct. 340.

■■■■■■■■

■■■■■■■

Before SEITZ, Chief Judge, and ADAMS and HUNTER, Circuit Judges.

―――――♦―――――

H. David Rothman, Pittsburgh, Pa., for Thomas Earl Phillips.

Samuel J. Reich, Cooper, Schwartz, Diamond & Reich, Pittsburgh, Pa., for Belmont Keresty.

Blair A. Griffith, First Asst. U. S. Atty., Richard L. Thornburgh, U. S. Atty., Kathleen Kelly Curtin, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

## OPINION OF THE COURT

JAMES HUNTER III, Circuit Judge.

We have before us the consolidated appeals of Belmont Keresty and Thomas Phillips who were found guilty by a jury in the Western District of Pennsylvania of violations of Title II—the Extortionate Extension of Credit Provisions—of the Consumer Credit Protection Act ("Act"), 18 U.S.C. § 891 et seq.[1] Appel-

1. The relevant sections of 18 U.S.C. are as follows:

§ 891. Definitions and rules of construction.

For the purposes of this chapter:

(1) To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

(2) The term "creditor", with reference to any given extension of credit, refers to any person making that extension of credit, or to any person claiming by, under, or through any person making that extension of credit.

(3) The term "debtor", with reference to any given extension of credit, refers to any person to whom that extension of credit is made, or to any person who guarantees the repayment of that extension of credit, or in any manner undertakes to indemnify the creditor against loss resulting from the failure of any person to whom that extension of credit is made to repay the same.

(4) The repayment of any extension of credit includes the repayment, satisfaction, or discharge in whole or in part of any debt or claim, acknowledged or disputed, valid or invalid, resulting from or in connection with that extension of credit.

(5) To collect an extension of credit means to induce in any way any person to make repayment thereof.

(6) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.

(7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

§ 892. Making extortionate extensions of credit.

(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

(1) The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor.

(A) in the jurisdiction within which the debtor, if a natural person, resided or

(B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business

at the time the extension of credit was made.

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either

lants' motions for judgment of acquittal and alternatively for a new trial were denied, United States v. Keresty, 334 F. Supp. 461 (W.D.Pa.1971), and this appeal followed. The question presented is whether the Act as construed and applied to appellants is a permissible exercise by Congress of its powers under the Commerce Clause of the Constitution.

## I

Appellants were convicted for engaging in extortionate credit activities subsequent to a gambling incident.[2] Although the facts are in some dispute, the following appears to have transpired. On August 18, 1969, appellant Keresty and one Louis Capo were engaged in a game of dice in New Brighton, Pennsylvania. At the end of the game, Keresty claimed that Capo owed him $8,000 and demanded payment. Capo disputed the debt[3] and indicated that in any event he did not have such a sum on hand. No threats were made at this time. Keresty made the demand

(A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or

(B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in subsection (b) (1) or (b) (2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension.

\*    \*    \*    \*    \*

§ 894. Collection of extensions of credit by extortionate means.

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collec-

tion, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b) (1) or the circumstances described in section 892 (b) (2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.

2. Keresty was found guilty of violating 18 U.S.C. § 892 (extortionate extension of credit), 18 U.S.C. § 894 (collection of an extension of credit through extortionate means) and 18 U.S.C. § 1952 (utilizing interstate travel to promote extortion in violation of a criminal law of Pennsylvania—18 P.S. § 4801). Phillips was not involved in any of the interstate aspects of this case and was convicted only for the 18 U.S.C. § 894 violation. Keresty does not appeal his conviction on the 18 U.S.C. § 1952 count.

3. According to Capo, the chief government witness, the game was played "for fun" with no payment expected by either par-

again the next day, was similarly rebuffed and thereafter resorted to a series of rather bizarre strategies to secure payment. Thus, four days later, he arrived at Capo's used car dealership and introduced appellant Phillips as "Tony from the syndicate," "Tony from Chicago" and "a syndicate enforcer," although the record indicates that Phillips was neither a representative of any "syndicate" nor from Chicago.[4] Demands for payment, coupled with blatant threats were then made, but to no avail, and appellants departed empty-handed. Keresty appeared a few days after this incident driving a car with Ohio license plates and promptly informed Capo that "this [was] a syndicate car."[5] He again demanded payment, making further references to "syndicate" involvement in financing his stake in the crap game as well as its "displeasure" that he (Capo) had not as yet been particularly cooperative. Capo again stated that he was unable to settle the debt without additional time and the debt was deferred to allow Capo sufficient time to raise the money.

In order to settle the debt, sundry arrangements were entered into by the parties with Capo finally agreeing, *inter alia*, to pay Keresty $2,000 in cash. A scheme of payment was outlined involving a fourth individual, whereby Keresty permitted Capo to repay part of the debt, while "extending credit" for the remainder. Although no interest payments were involved, the unpaid portion was apparently to be paid in specified amounts and at stated intervals.[6] After the agreement was finalized, appellants departed, warning Capo in no uncertain terms what would happen if he did not live up to his bargain.[7] Although Capo was able to meet the first few installments he subsequently was unable to continue the payments and his life was once again threatened.

Against the background of this unsavory conduct appellants wisely do not argue insufficiency of the evidence. Rather, they contend that in enacting the Extortionate Extension of Credit Provisions, Congress simply did not intend to cover this type of "local gambling debt" and that the Act's proscription should be interpreted as extending only to transactions involving that class of underworld species colloquially referred to as "loan sharks." Specifically, they argue that the Act should be held inapplicable to the facts at hand since there was allegedly no "extension of credit" as contemplated by the Act, that a "debt" rather than a "loan" was at issue and that there were no interest payments ever added to the amount claimed due. Alternatively, they contend that if their activities were covered by the Act, the Act must be held unconstitutional as applied.

## II

We conclude that the credit transactions here at issue were, in fact, violative of Title II of the Act. The

---

ticipant. Although it is highly unlikely that two grown men would engage in a twelve-hour crap game "for fun," this controversy does not bear on the issues of this case as it is not disputed by appellants that the game took place and that payment was in fact demanded.

4. Apparently, Phillips' only role in this scheme was to stand silently at Keresty's side and appear as menacing as possible.

5. Keresty had traveled to Cleveland for the express purpose of borrowing a car with Ohio license plates and as there is no evidence of any "syndicate" involvement, we assume that this ruse was simply another attempt to frighten Capo. This

trip was, however, the basis of the 18 U.S.C. § 1952 count.

6. The Government contends that more than one "extortionate extension of credit" transaction transpired, including separate "extensions of credit" with each roll of the dice. This is not, however, in issue as appellants conceded at oral argument that the "extortionate extension of credit" can occur *after* the transaction—here the crap game—had transpired. For purposes of this appeal, we will assume that the extensions of credit occurred subsequent to the game.

7. Further negotiations, not relevant here, resulted in Capo's issuing additional checks totalling $1500.

plain language of Section 891(1) defines an "extension of credit" as "to make or renew any loan, *or to enter into any agreement,* tacit or express, *whereby the repayment or satisfaction of any debt or claim,* whether acknowledged or disputed, valid or invalid, and *however arising, may or will be deferred.*" [8] Further, Section 891(6) defines an "extortionate extension of credit" as *"any extension of credit* with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." [9] Finally, Section 892 states that its terms encompass *"whoever makes any* extortionate extension of credit. . . ." [10]

Our reading of the legislative history [11] supports the conclusion that Congress intended to attack the economic base of organized crime and therefore did not restrict its efforts to those financial dealings which necessarily included each of the various attributes of a loan shark transaction. In a section entitled "General Applicability" Congress stated:

"The full utility of chapter 42 as a weapon in the war on organized crime obviously cannot be assessed until it has been tested in battle. Some general observations, however, appear to be in order at this point. *As noted above, it is not, and is not intended to be, a Federal usury law, nor does it have anything to do with interest rates as such.* It is, rather, a deliberate legislative attack on the economic

foundations of organized crime. *Most of the business of the underworld, whether in loan sharking, gambling, drugs, 'protection,' or other activities, involves extensions of credit as refined in section 891 at one or more stages.* The methods used in the enforcement of such obligations are notorious. Thus, a very large proportion of underworld financial transactions fall within the ban of one or more of the provisions of chapter 42. It may very well develop that this chapter will find as much usefulness in the investigation and prosecution of transactions entirely within the world of organized crime as it does in connection with transactions between those within that world and those who are otherwise outside it. *Be that as it may, the conferees wish to leave no doubt of the congressional intention that chapter 42 is a weapon to be used with vigor and imagination against every activity of organized crime that falls within its terms."* 1968 U.S. Cong. & Adm.News, p. 2029. (emphasis added).[12]

Finally, had Congress intended to limit the Act to loan sharks, it could have easily so provided. For example, loan sharking has often been considered solely in terms of the interest rates charged —namely, "vigorish"—as in the report of a New York State Commission which defined the practice as "the charge of unconscionably high and onerous rates of interest on loans of money." [13] However, after extensive hearings, Congress did not choose to attack the problem as so defined. Rather, the federal crime relates to "extortionate credit transac-

8. *Supra,* n. 1 (emphasis added).

9. *Supra,* n. 1 (emphasis added).

10. *Supra,* n. 1 (emphasis added).

11. 1968 U.S.Code Cong. & Admin.News, p. 2028.

12. See also Hearings on Impact of Crime on Small Business before the Senate Select Commission on Small Business, 90th Cong., 2d Sess. 127 (1968) (hereinafter cited as Senate Hearings), where evidence

was presented to the effect that gambling establishments are often frequented by individuals quite willing to provide additional stakes for patrons whose own financial resources were exhausted.

13. New York State Commission of Investigation, The Loan Shark Racket 7 (1965). See also statement of Deputy Attorney General Henry Peterson in Senate Hearings at 31.

tions," "however they may arise," *supra* n. 1, and the Act recites express congressional findings that *"extortionate credit transactions* are characterized by the use, or the express or implicit threat of the use, of violence or other criminal means to cause harm to person, reputation, or property as a means of enforcing repayment." [14] Thus, the very approach of the Act is to define extortionate credit transactions in terms of this express finding rather than imposing a requirement that the prosecution prove each of the elements of a loan shark transaction qua loan shark transaction.

In brief, both the statutory language and legislative history support a broad interpretation of "extortionate extension of credit." While Congress was perhaps primarily concerned with the loan shark threat, we can conclude "with certainty sufficient to justify a criminal conviction" that Congress intended to proscribe the conduct here in issue. *Cf.* Rewis v. United States, 401 U.S. 808, 811, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971).

### III

We now reach the question of whether the Act is constitutional as applied to the facts of this case.

In earlier criminal statutes enacted pursuant to the Commerce Clause, Congress traditionally included in the definition of the crime a requirement that a specific connection be demonstrated between the defendant's activities and interstate commerce.[15] With respect to the Extortionate Extension of Credit Provisions, Congress in its "Findings and Declaration of Purpose" determined that extortionate extensions of credit *intrinsically* affect interstate commerce.[16] As a result, the prosecution has been relieved of the burden of alleging and

---

14. 18 U.S.C. § 891, *infra* n. 15 (emphasis added).

15. See, for example, the Hobbs Act, 18 U.S.C. § 1951 (obstructing or affecting interstate commerce or movements of commodities in commerce by robbery or extortion) and the Mann Act, 18 U.S.C. § 2421 (transporting women in interstate commerce for prostitution, etc.).

16. 18 U.S.C. § 891, note:
"(a) The Congress makes the following findings:
"(1) Organized crime is interstate and international in character. Its activities involve many billions of dollars each year. It is directly responsible for murders, willful injuries to person and property, corruption of officials, and terrorization of countless citizens. A substantial part of the income of organized crime is generated by extortionate credit transactions.
"(2) *Extortionate credit transactions* are characterized by the use, or the express or implicit threat of the use, of violence or other criminal means to cause harm to person, reputation, or property as a means of enforcing repayment. Among the factors which have rendered past efforts at prosecution almost wholly ineffective has been the existence of exclusionary rules of evidence stricter than necessary for the protection of constitutional rights.

"(3) *Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce. Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce.*
"(4) Extortionate credit transactions directly impair the effectiveness and frustrate the purposes of the laws enacted by the Congress on the subject of bankruptcies.
"(b) On the basis of the findings stated in subsection (a) of this section, the Congress determines that the provisions of chapter 42 of title 18 of the United States Code [this chapter] are necessary and proper for the purpose of carrying into execution the powers of Congress to regulate commerce and to establish uniform and effective laws on the subject of bankruptcy." (Emphasis added).
A similar determination was made by Congress in passing the Drug Abuse Control Amendments of 1965 to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. There, too, Congress imposed criminal sanctions upon certain classes of activities without requiring proof that the particular activity against which the sanction was imposed had an effect on interstate commerce.

**42**

proving that the particular activity involved in each individual case has affected interstate commerce.

The validity of this approach in general and of the Act in particular was reaffirmed by the Supreme Court in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), *followed* by United States v. DeCarlo, 458 F.2d 358 (3d Cir. January 12, 1972). See also United States v. Riehl, 460 F.2d 454 (3d Cir. May 9, 1972). Although the defendant in *Perez* was undisputedly a "loan shark," the Court held that *"extortionate credit transactions* though purely intrastate, may in the judgment of Congress affect interstate commerce," *supra,* 402 U.S. at 154, 91 S.Ct. at 1361, and that Congress' prohibition of *extortionate credit transactions* was within the realm of federal power under the Commerce Clause.

Relying on the "class of activities" test employed, for example, in United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258, the Court then concluded that *Perez* was "clearly a *member of the class* which engages in *'extortionate credit transactions'* " as defined by Congress, 402 U.S. at 153, 91 S.Ct. at 1361, and where the "class of activities" is within the reach of federal power, the courts have no power " 'to excise as trivial individual instances' of the class," 402 U.S. at 154, 91 S.Ct. at 1361, citing Maryland v. Wirtz, 392 U.S. 183, 193, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). Thus, the constitutionality of the Act is settled as to its application to a purely intrastate extortionate extension of credit—albeit one involving a "typical" loan shark.

Appellants, while conceding that it is unnecessary to show an *actual* effect on interstate commerce in a loan shark prosecution such as *Perez,* nevertheless contend that Congress had no authority to even proscribe the type of extortionate credit transaction at issue here.

Specifically, they contend that the class is not rationally defined and question their very inclusion within that class.

The *Perez* decision, while concluding that there was an adequate basis for the congressional finding that *"loan sharking"* had a substantial adverse effect on interstate commerce, did not, of course, refer to any other subclass of extortionate credit transactions. Further, it is true that Congress did not break down its findings and did not recite any specific conclusions regarding the precise type of extortionate credit transaction involved here. However, *Perez* explicitly rejected the argument advanced by appellants, that Congress must, in fact, do so: "We have mentioned in detail the economic, financial, and social setting of the problem as revealed to Congress. *We do so not to infer that Congress need make particularized findings in order to legislate."* 402 U.S. at 156–157, 91 S.Ct. at 1362 (emphasis added).

■ Although the fact that Congress has stated that a particular activity affects interstate commerce, that determination does not preclude further examination by the Courts, Katzenbach v. McClung, *supra,* 379 U.S. at 298, 85 S.Ct. 377. However, our inquiry is carefully circumscribed and we need only address ourselves to two questions: (1) Was there a rational basis for Congress' findings that extortionate extensions of credit affect interstate commerce; and (2) If it had such a basis, whether the means it selected to eliminate that evil are reasonable. Heart of Atlanta Motel, Inc., *supra,* 379 U.S. at 258–259, 85 S.Ct. 348.

■ Our answer to the first question must be in the affirmative. As to the second, it is equally clear that the means employed are indeed reasonable in light of Congress' efforts to attack the economic base of organized crime through the proscription of extortionate credit transactions. It is sufficient that Congress has defined a limited class of credit transactions, *i. e.,* those involving extortionate means of extension and collection, as having a substantial effect on

interstate commerce. That this particular transaction cannot be directly tied to organized crime, does not affect the validity of the congressional approach employed here. So long as the goal is within the power of Congress, we will not substitute our judgment for the judgment of Congress as to the wisdom of this particular statutory scheme. *See* United States v. Reihl, *supra.*[17]

The judgments will be affirmed.

17. We do not need reach the Government's alternate contention that the Act is an

appropriate exercise of Congressional power under the Bankruptcy Clause.