UNITED STATES of America,
Plaintiff-Appellee,

v.

Samuel J. ANNERINO et al.,
Defendants-Appellants.

Nos. 73-1201–73-1203.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1974.

Decided April 12, 1974.

John C. Ambrose and Philip J. Schmidt, Jerome Feldman, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Frederick H. Branding, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before KILEY, Senior Circuit Judge, SPRECHER, Circuit Judge, and JAMESON,* Senior District Judge.

JAMESON, Senior District Judge.

Appellants were convicted in a nonjury trial of conspiracy to use extortionate means, as defined in 18 U.S.C. § 891(7)[1], to collect and attempt to collect an extension of credit from Ernest White and to punish White for nonrepayment, in violation of 18 U.S.C. § 894.

*Statement of Facts*

The evidence, in the light most favorable to the Government, may be summarized as follows:

White had shared an office with appellant Metrick. When White left he owed Metrick approximately $3,500. Between September, 1970 and June, 1971 White made two payments by check on this debt.

On June 19, 1971 appellant Bean, with Jeff Metrick, who was indicted but acquitted, visited White. Jeff Metrick told White that they had taken over his debt to Jeff's brother Brian and were there to collect $7,000. When White disputed the amount, Bean said that there "wasn't going to be any further monkeying around on this, that they were going to collect the money"; that if White didn't come up with the money, he could be "severely hurt" and that since they knew where his children lived, he should take that into consideration.

White called Brian Metrick and asked if the visit was a joke. He was told that Metrick had assigned his debt as collateral for a loan and that it "was completely out of his hands", and because he was dealing with "very dangerous people", who "meant what they said", he should do everything possible to pay off the loan. White then contacted the F.B.I. and subsequent conversations were surveilled.

---

* Senior District Judge William J. Jameson of the District of Montana is sitting by designation.

1. § 891(7) defines an "extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

White met with the three appellants at a restaurant on June 25, 1971 when, after some discussion, Annerino said "Let's cut out the bullshit and get down to the business why we are here". Annerino told White to bring the $2,250, which White admitted owing, the following Monday, when they would determine the exact amount of the balance owing and the manner of payment. Annerino stated that they knew where White's wife lived and where his daughters attended school; that White should forget any ideas about going to the authorities because Annerino would be "out on bond damn quick" and they were backed by a large organization with "five or six guys that could take his place". Bean stated that if White were going into the hospital, "it was going to be because they put him there" and that if he had any thought of running and hiding he better do it pretty fast. Annerino said it wouldn't do White or his family any good if he did flee.

A few days later White met with Bean and Brian Metrick. Bean arrived first and when he found White did not have the money, stated that Annerino was "uncontrollable and had a very bad temper" and if he were present and found White did not have the money, he would have "pulled a gun and shot [White's] guts out right under the table". After Metrick arrived there was some discussion regarding another meeting and the payment of $4,000 in addition to the $2,250, and Bean said if White didn't make the payments they were going to "dig [him] a big hole".

In monitored telephone conversations Metrick told White, *inter alia*, that "Sam [Annerino] and Harold [Bean] are just enforcers. They report to somebody else"; that "these fellas have killed people, to be perfectly honest with you"; that if White did not show up with the money, "they'll kill you". Bean asked White if he wanted to "end up in a coffin".

## Contentions on Appeal

All appellants contend that the indictment should have been dismissed because it was based upon the hearsay testimony of one F.B.I. agent. Annerino argues that (1) the district court erred in not dismissing his case for the denial of a speedy trial; (2) a statement made by him was admitted in violation of *Miranda*; (3) the trial court erred in admitting hearsay statements of his co-conspirators; and (4) the evidence was insufficient to sustain the conviction. Bean and Metrick contend that the Government failed to present required proof that they were members of organized crime and their activities involved an extortionate extension of credit. All appellants argue that the Government failed to prove that White's debt involved an extension of credit, as defined in 18 U.S.C. § 891(1).

## Indictment

The grand jury heard the testimony of one F.B.I. agent who related conversations he had with White and conversations White had with appellants and related to the agent. In addition the jury heard tapes of conversations between White and appellants, with the F.B.I. agent, who had monitored and recorded the tapes, stating the names of the speakers.

Indictments based upon hearsay of this nature are not improper. As this court said in United States v. Aloisio, 440 F.2d 705, 707 (1971), cert. denied, 404 U.S. 824, 92 S.Ct. 49, 30 L.Ed. 2d 51 (1971):

"In Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, the Supreme Court categorically refused to invalidate an indictment based upon hearsay evidence under either the Fifth Amendment or its supervisory powers over federal courts. This Court has repeatedly rejected similar attacks upon the quality of evidence relied upon by grand juries."

■ It is true, as appellants argue and this court has recognized, that the Second Circuit has criticized the practice of relying on investigative reports and similar hearsay before a grand jury. In United States v. Estepa, 471 F.2d 1132 (2 Cir. 1972), upon which appellants heavily rely, judgments of conviction were reversed with instructions to dismiss the indictment, where the jury may have been misled into thinking it was getting eyewitness testimony whereas it was actually being given an account whose hearsay nature was concealed.[2] There is no evidence here to suggest that the grand jurors may have been misled into thinking the agent was testifying from personal knowledge. Nor is there merit in appellant's argument that if White had testified the jurors could have questioned him and concluded that an indictment should not be returned.

*Speedy Trial*

The indictment was returned on July 20, 1971, and the trial commenced on November 3, 1972. Annerino contends that this 15-month delay violated his Sixth Amendment right to a speedy trial.

In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) the Court, recognizing that the right to a speedy trial "is necessarily relative", 407 U.S. at 522, 92 S.Ct. 2182, identified four factors to be considered in determining whether a particular defendant has been deprived of his right: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S.Ct. at 2192.

The Government concedes that a 15-month delay in this type of case gives rise "to a certain presumed amount of prejudice". The delay in itself, however, does not constitute a denial of the right to a speedy trial. As the court noted in *Barker,* there is "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months", 407 U.S. at 523, 92 S.Ct. at 2188, and we have previously held that even longer delays in cases of a similar nature are not *per se* deprivations of the right to a speedy trial. See, for example, United States v. DeTienne, 468 F.2d 151, 156–157 (7 Cir. 1972), cert. denied, 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973) (19-month delay).

The Government correctly points out that the reason for the 15-month delay is attributable to an "amalgam of factors". On October 8, 1971 counsel for Annerino made his first appearance in connection with a Government request for a protective order with respect to surveillance tapes. The court noted that "we are nowhere near ready for trial" and set a motion schedule pursuant to local court rules.

At a status hearing on November 10, 1971 counsel for Annerino's co-defendants were granted an additional 14 days to file motions. Without objection the case was continued until January 27, 1972. At another status hearing on that date counsel for co-defendant Bean was granted an additional ten days to file a motion to suppress. On March 28 the trial was set for June 20. On June 20 the court was informed that counsel for Bean was engaged in a trial and that counsel for the Metricks had suffered a heart attack and would "not be available for trial until the fall". Counsel for Annerino was granted ten days to file a memorandum in support of a renewed motion to dismiss for lack of a speedy trial.

At a further hearing on July 21, 1972 [3] the court suggested that "If Mr.

---

2. The court noted that it had in many opinions affirmed convictions "despite the Government's needless reliance on hearsay before the grand jury", in the absence of evidence that the jury had been deceived or misled or that the case involved "a high probability that with eyewitness rather than hearsay testimony the grand jury would not have indicted". 471 F.2d at 1137.

3. It appeared at this hearing that counsel for Annerino had failed to file his memorandum

Annerino wants a speedy trial, he can go to trial next Monday, separated from the other defendants". The Government indicated that some of its witnesses would not be available, and the court set the trial for September 21. The Government was ready for trial on that date, but the court was informed that counsel for Bean was commencing a trial before another judge and counsel for the Metricks would not be recuperated from his heart attack until mid-October. The court continued the case to November 1, noting that he did not think the "circumstances of this delay" sufficiently prejudicial to Annerino to "justify separating him out for a separate trial".

In discussing the reason for the delay the Court stated in *Barker, supra* at 531, 92 S.Ct. at 2192:

"Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witnesss, should serve to justify appropriate delay."

The delay in this case does not evince a deliberate attempt by the Government to hamper the defense. It resulted from a variety of circumstances, including the Government's desire for a single trial. Although this desire "hardly warrants unquestioning acceptance when pitted against a single defendant's right to a speedy trial, on the scale of possible justifications for the delay this reason deserves some deference" where, as here, the charge is conspiracy. *DeTienne, supra* at 157.

The third factor to be considered in assessing a speedy trial issue is the defendant's assertion of his right. Although Annerino first raised this issue in a motion to dismiss on April 17, 1972, the Court in *Barker, supra* at 525, 92 S. Ct. at 2189, rejected the notion that "a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial". Annerino renewed his motion to dismiss on June 20. Although dilatory in filing a brief in support of the renewed motion, see Note 3, *supra,* the district court accepted the brief. Thereafter Annerino protested the continuances granted on July 21 and September 21, and demanded an immediate trial. At the September 21 hearing the district court stated that "the case can't be postponed forever * * * because we have one defendant in the case who on every occasion has been insisting on an immediate trial." It is clear from the record that Annerino appropriately asserted his right to a speedy trial.

The fourth factor to be considered is prejudice to the defendant, with respect to which the Court has indicated that the right to a speedy trial was intended: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker, supra* at 532, 92 S. Ct. at 2193.

Annerino contends that during the trial there were several memory lapses crucial to the defense. We have examined the trial transcript and conclude that the memory lapses to which Annerino refers were of a minor nature and were in no way significant to the outcome. See *Barker, supra* at 534, 92 S.Ct. 2182. The conclusory allegations of general anxiety and depression, travel retrictions and an inability to secure employment constitute a showing of only

in support of the motion to dismiss within the ten day period granted on June 20. The late memorandum was presented at the hearing by Annerino's counsel and the court, noting that it had denied the motion to dis-

miss by an order entered July 20, accepted the memorandum stating "I will consider your briefs and vacate the order if they convince me that I should."

minimal prejudice of a kind normally attending criminal indictment. This prejudice, "unenhanced by tangible impairment of the defense function and unsupported by a better showing on the other factors than was made here, does not alone make out a deprivation of the right to speedy trial". *DeTienne, supra,* at 158.

■ Although Annerino appropriately asserted his speedy trial right, the length of the delay was not extraordinary, he was free on bond before trial, prejudice was minimal, and the delay was not a deliberate attempt by the Government to gain a tactical advantage over Annerino or to harass him. We conclude that under these circumstances Annerino's right to a speedy trial was not violated.

### Admission of Evidence

Annerino claims error in the admission of testimony by an F.B.I. agent with respect to statements made by Annerino following his arrest, arguing that the Government failed to show that he had been advised of his rights and waived them, as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). The F.B.I. agent testified, however, without contradiction, that immediately upon his arrest Annerino was fully advised of his *Miranda* rights and thereafter freely answered the agent's questions.

■ Annerino also challenges the admission of surveillance tapes containing hearsay statements by his co-conspirators. However, "extra-judicial statements * * * of co-conspirators occurring during a conspiracy in furtherance of it have long been held to be competent evidence against their partners in crime under the ancient co-conspirators exception to the hearsay rule." United States v. Cerone, 452 F.2d 274, 282 (7 Cir. 1971), cert. denied, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972); see

also Dutton v. Evans, 400 U.S. 74, 81, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

### Sufficiency of Evidence

We find no merit in Annerino's contention that there was no proof of his involvement in a conspiracy or that he threatened White. The evidence set forth *supra* established Annerino's participation in the conspiracy as well as actual threats against White and his family.

Bean and Metrick argue that the Government failed to offer required proof that they were members of organized crime and that the debt owed by White involved an extortionate extension of credit.

Appellants were convicted of violating a provision of Title II of the Consumer Credit Protection Act of 1968 (Pub.L. 90–321), 82 Stat. 159, 18 U.S.C. § 894(a):

> "Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
>
> "(1) to collect or attempt to collect any extension of credit, or
>
> "(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."

■ It is true, as Bean and Metrick contend, that Title II was primarily intended to attack the economic basis of organized crime.[4] They argue that a conviction under Title II may not be sustained absent proof that the defendants are members of organized crime.

Section 894(a) is not limited, however, to members of organized crime, but broadly applies to "whoever" uses extortionate means to collect an extension of credit. Likewise, its companion provision, 18 U.S.C. § 892(a), applies to "[w]hoever makes any extortionate extension of credit". Although Congress was primarily concerned with organized crime, it is clear that a means chosen to

---

4. See Conference Report No. 1397, 90th Cong., 2d Sess. (1968).

attack it was the proscription of a class of activities, that is, extortionate credit transactions.[5] It is not necessary that the participants in the transaction be members of organized crime or that the particular activity has affected interstate commerce.

The Supreme Court affirmed the validity of the approach employed in Title II with respect to an intrastate extortionate credit transaction in Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). While *Perez* was concerned with "loan sharking" activities, the Court held that "Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce", and that the prohibition of extortionate credit transactions was within the realm of Congressional power under the Commerce Clause. 402 U.S. at 154, 91 S.Ct. at 1361.[6]

In United States v. Keresty, 465 F.2d 36 (3 Cir. 1972), cert. denied, 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (1972), it was held that Title II could validly be applied to a local gambling debt which could not be tied directly to organized crime. The court concluded, as we do, that the holding in *Perez* was not limited to loan shark transactions and that Congress had a rational basis in attacking the economic base of organized crime through the proscription of extortionate credit transactions. The court concluded:

"It is sufficient that Congress has defined a limited class of credit transactions, i. e., those involving extortionate means of extension and collection, as having a substantial effect on interstate commerce. That this particular transaction cannot be directly tied to organized crime, does not affect the validity of the congressional approach employed here. So long as the goal is within the power of Congress, we will not substitute our judgment for the judgment of Congress as to the wisdom of this particular statutory scheme." 465 F.2d at 42–43.

Bean and Metrick next contend that a § 894 violation requires proof that the underlying debt was a "juice loan", that is, an extortionate extension of credit.[7] As noted *supra,* § 892 proscribes the making of extortionate ex-

---

5. See Note under 18 U.S.C. § 891. Section 201 of Pub.L. 90–321 provided that:

"(a) The Congress makes the following findings:

"(1) Organized crime is interstate and international in character. Its activities involve many billions of dollars each year. It is directly responsible for murders, willful injuries to person and property, corruption of officials, and terrorization of countless citizens. A substantial part of the income of organized crime is generated by extortionate credit transactions.

"(2) Extortionate credit transactions are characterized by the use, or the express or implicit threat of the use, of violence or other criminal means to cause harm to person, reputation, or property as a means of enforcing repayment. Among the factors which have rendered past efforts at prosecution almost wholly ineffective has been the existence of exclusionary rules of evidence stricter than necessary for the protection of constitutional rights.

"(3) Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce. Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce.

"(4) Extortionate credit transactions directly impair the effectiveness and frustrate the purpose of the laws enacted by the Congress on the subject of bankruptcies."

6. The Court said further:

"Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to exercise, as trivial, individual instances' of the class." *Id.*

7. As defined in 18 U.S.C. § 891(6) an extortionate extension of credit is "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person."

tensions of credit while, on the other hand, § 894 forbids extortionate collection of "any extension of credit". It is thus clear that § 894 "is directed to the use of extortionate means in order to collect monies which the creditors maintain are owing to them, regardless of whether the loan arose from a traditional type of loan or resulted from the assumption of responsibility as a result of force or threats". United States v. Briola, 465 F.2d 1018, 1021 (10 Cir. 1972), cert. denied, 409 U.S. 1108, 93 S. Ct. 903, 34 L.Ed.2d 688 (1973).[8]

Finally, all appellants contend that the Government failed to establish an extension of credit. The term "to extend credit", as broadly defined in 18 U.S.C. § 891(1), "means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisifaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred".

There was substantial evidence that White was indebted to Brian Metrick and that there existed an agreement whereby repayment would be deferred. At the restaurant on June 25 Annerino told White to bring $2,250, which White admitted owing, the following Monday, when they would determine the exact amount of the balance owing and the method of payment. The fact that White's indebtedness arose through his unauthorized use of Metrick's credit cards and misappropriation of partnership funds is irrelevant, since § 891(1) applies to "any debt * * *, valid or invalid, and however arising".

The evidence was sufficient to sustain the conviction of each appellant.

Affirmed.

8. The Congressional intent with respect to § 894(a) is stated as follows:
    "Not everyone who falls into the clutches of a loan shark is necessarily aware at the outset of the nature of the transaction into which he has entered. Moreover, cases will arise where the use of extortionate means of collection can be demonstrated even though it cannot be shown that a bi-

lateral understanding that such would be the case existed at the outset. Section 894(a) covers these situations by making it a criminal offense to collect an indebtedness by extortionate means, regardless of how the indebtedness arose." Conference Report No. 1397, 90th Cong., 2d Sess. (1968).