UNITED STATES of America, Appellee,

v.

Jack G. SCHWARTZ and George Sarkis, also known as "George", Appellants.

No. 341, Docket Nos. 76–1324, 76–1347.

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1976.

Decided Jan. 25, 1977.

**428**

Roy M. Cohn, New York City (Saxe, Bacon & Bolan, Michael Rosen, Ronald F. Poepplein, New York City, of counsel), for appellant Jack G. Schwartz.

John Nicholas Iannuzzi, New York City, for appellant George Sarkis.

Steven Kimelman, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., Bernard J. Fried, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.

HAYS, Circuit Judge:

After a jury trial, appellants Jack Schwartz and George Sarkis were convicted of having employed extortionate means to collect extensions of credit, in violation of 18 U.S.C. §§ 2, 894. Each now urges that the evidence at trial was insufficient to sustain his conviction and that the prosecuting attorney's use of the term "Mafia" in questioning a defense witness injected such prejudice into the trial as to warrant our reversal of the convictions. In addition, Schwartz contends that the jury's verdict of guilty was inconsistent with the acquittal on a conspiracy count and was therefore ground for reversal. We reject these contentions and affirm the judgments of the district court.

**I**

Schwartz and Sarkis contend that section 894 was intended "as a weapon in the war on organized crime." They assert that, since there was no evidence at trial that either was involved with organized crime, their convictions under section 894 cannot be sustained. We agree that the record contains no proof that either Schwartz or Sarkis had dealings with organized crime. We agree likewise that, in enacting section 894, Congress thought it could effectively be employed against large-scale criminal organizations. Conf.Rep.No. 1397, 90th Cong., 2d Sess., 2 U.S.Code Cong. & Admin.News 2021, at 2029 (1968). However, we are no longer free to agree with appellants that Congress intended thus to limit the scope of section 894. It suffices that the government proved that Schwartz and Sarkis attempted, or aided and abetted attempts, to collect extensions of credit by extortionate means. *United States v. Sears*, 544 F.2d 585 (2d Cir. 1976); *United States v. Andrino*, 501 F.2d 1373, 1377 (9th Cir. 1974); *United States v. Annerino*, 495 F.2d 1159, 1164–65 (7th Cir. 1974); *United States v. Keresty*, 465 F.2d 36, 39–41 (3d Cir.), *cert. denied*, 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (1972). *See also Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). We undertake our

review of the sufficiency of the evidence with this conclusion in mind.

Schwartz was the president of Gaines Service Leasing Corp., a Brooklyn-based organization which extended credit to one Fred McGee in the form of a purchase and leaseback of trucking equipment. McGee fell into default on his obligations to Gaines at about the time that Gaines itself was encountering financial difficulties. Schwartz became concerned about collecting the indebtedness of McGee and of another trucker, Jack Taylor, since Schwartz considered both of these delinquencies as major factors in Gaines' troubles. Schwartz sought unsuccessfully to persuade McGee and Taylor to make good their obligations to Gaines; also to no avail, Grove Ebbert, a Gaines employee who in the past had repossessed leased equipment for Gaines, attempted to collect the delinquent amounts. In April, 1975, Schwartz employed Sarkis to assist Ebbert. Sarkis, who resided in Puerto Rico and was a former boxer, had been recommended to Schwartz by Schwartz' friend, Jack Cohen. Cohen's father had employed Sarkis as a bodyguard during a strike at the former's Puerto Rican factory. Sarkis was flown from Puerto Rico to New York City and accommodated at Gaines' expense in a Brooklyn motel. Though Sarkis' employ for Schwartz was only of a few days' duration, Sarkis was paid about a thousand dollars for his services.

During Sarkis' stay in New York, he and Ebbert paid four visits to McGee's Long Island home; on the fourth visit, one of the pair set fire to McGee's garage and automobile.

Sarkis contends that the evidence shows, not the use of extortionate means to collect extensions of credit as required by section 894, but only a wanton arson which was not a federal offense. Our view of the evidence is otherwise. The first visit by Sarkis and Ebbert to McGee's home occurred about midnight, April 21, 1975. The following morning, April 22, Sarkis and Ebbert again visited McGee's residence. There was evidence that Sarkis told McGee

that he was employed by Schwartz and wanted $5,000 that McGee owed to Gaines. Sarkis told McGee that he did not want to "hurt McGee physically." Ebbert, in Sarkis' presence, told McGee that, if he failed to pay in two days, Ebbert and Sarkis would return to break his legs. Sarkis failed to dissociate himself from Ebbert's threat. Considering the surrounding circumstances, in particular the midnight timing of the previous visit to McGee's home and Sarkis' silent acquiescence in Ebbert's explicit threat of violence to McGee, the jury could have concluded beyond a reasonable doubt that Sarkis' own statement that he did not want to hurt McGee was an implicit threat that Sarkis would put aside his compunctions against physical violence if McGee did not pay his debt to Gaines.

In any event, the jury could have concluded that the subsequent fire was part of a design by Sarkis to secure payments from McGee. On April 23, Sarkis and Ebbert returned to McGee's home. After being told that McGee was away, they went to a barroom. While drinking there, according to Ebbert, Sarkis hatched the plan to commit the arson. Sarkis apparently suggested setting the fire immediately after reporting to Ebbert a telephone conversation with Schwartz in which Schwartz had told Sarkis that he "was tired of being made a fool of." Ebbert testified further that Sarkis originally contemplated burning McGee's house but ultimately concurred in Ebbert's suggestion that the fire be set only to the garage since Gaines would not be able to collect from McGee if McGee died in a fire. From the barroom, the two men drove back to McGee's house where, again according to Ebbert, Sarkis set the fire. In view of the earlier threats to McGee and demands for payment, these circumstances entitled the jury to conclude that Sarkis set the fire to promote the end which he was well paid to secure, namely, the collection of extensions of credit from McGee. This is precisely the conduct which section 894 condemns.

Schwartz' case is closer, but we believe that the evidence affords a sufficient basis for affirming his conviction of aiding and

abetting attempts to collect credit by extortionate means. *See generally United States v. Taylor*, 464 F.2d 240, 244–45 (2d Cir. 1972). Schwartz testified at trial that Sarkis had been transported from Puerto Rico and employed in order to provide protection for Ebbert. Schwartz testified, and his testimony was corroborated, that Victor Mignoli, who along with McGee and Taylor was a trucker indebted to Gaines, had told him that McGee was armed with a shotgun and would shoot anyone from Gaines who attempted to repossess his equipment. Ebbert, on the other hand, denied suggesting to Schwartz that he was in need of protection. In addition, Ebbert testified that, when asked why he had brought Sarkis from Puerto Rico, Schwartz responded that he wanted to "put a scare into Fred McGee. . . ." There was evidence that Schwartz had previously stated he would "fix" Fred McGee and "get blood from that Black son of a bitch." The jury, of course, was free to discredit Schwartz' explanation for employing Sarkis and to accept the evidence which inculpated Schwartz.

Several days after the fire, when McGee visited Schwartz to obtain assurances against further violence, Schwartz stated he would "guarantee" to McGee that "nobody will both you" if Gaines was repaid. Schwartz contends that he cannot be convicted on the sole basis of the "guarantee," an implicit threat which followed the fire, since the indictment charged Schwartz with "threatening Fred McGee . . . and *thereafter* using violence . . .". (Emphasis supplied.) We need not reach the question whether the indictment sufficed to afford notice to Schwartz that he would be charged with the post-violence threat, *see* Fed.R.Crim.Pro. 7(c), for we consider the evidence concerning the post-fire conversation between McGee and Schwartz only insofar as it tends to establish Schwartz' intent in employing Sarkis and transporting him to New York City. Coupled with the other evidence, Schwartz' "guarantee" to McGee is sufficient to warrant the conclusion that Sarkis was brought to New York by Schwartz with the intent that he use extortionate means, *i. e.*, threats of violence, in attempting to collect extensions of credit from McGee. The evidence, moreover, establishes that Sarkis made extortionate threats to McGee before the arson. Thus the evidence was adequate to link Schwartz with threats to McGee made prior to the violence alleged in the indictment.

Since the indictment alleged that Schwartz aided and abetted violations of section 894, and the proof outlined above sustained such a finding, Schwartz was properly held liable as a principal. 18 U.S.C. § 2.

## II

Schwartz argues that, whether or not the evidence was otherwise sufficient to sustain a conviction of aiding and abetting, the guilty verdict of aiding and abetting cannot stand since, in light of the trial court's instructions to the jury, the guilty verdict was inconsistent with the jury's acquittal on a conspiracy count. Schwartz apparently contends that the judge instructed the jury that conspiracy and aiding and abetting were essentially the same; therefore, he asserts, by acquitting Schwartz on a conspiracy count, the jury was bound to acquit on the aiding and abetting theory as well.

██ It is of course a commonplace that the jury is bound to follow the trial court's instructions concerning the law. We disagree, however, that the trial court confused aiding and abetting with conspiracy in its instruction to the jury. In fact, the judge warned the jury to take care to distinguish the two concepts:

"The crime of conspiracy sounds like aiding and abetting, and in trying to distinguish the difference between one who aids and abets and one who willfully participates in a crime, although he does not commit the crime himself, or in a conspiracy where he fully enters a conspiracy and helps it along, sounds almost like the same definition. But the significant difference is a theoretical one, a conceptual one. You cannot have aiding and abetting unless you prove the substantive

crime has been committed. In conspiracy you do not have to prove that the substantive crime has been committed, because it is the agreement, the going in with others to commit the crime that the law proscribes and says is a crime, and not the commission of the crime.

"In conspiracy the crime has been completed. It is difficult to explain the practical difference, so I warn you of that before I tell you what a conspiracy is: . . ."

Trial Transcript at 3366–7.

In any event, even were we to agree with Schwartz that the jury reached inconsistent verdicts, we would not set aside the conviction based on aiding and abetting. As in *Steckler v. United States*, 7 F.2d 59, at 60 (2d Cir. 1925) (L. Hand, J.),

"[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

"That the conviction may have been the result of some compromise is, of course, possible; but to consider so is to consider too curiously, unless all verdicts are to be upset on speculation."

*Accord, United States v. Zane*, 495 F.2d 683, 690 (2d Cir.), *cert. denied*, 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), and cases cited therein.

### III

Schwartz and Sarkis also argue that the prosecutor's use of the word "Mafia" in cross-examining a defense witness infected the trial, so that our reversal of the convictions is now warranted. We fail to perceive any error in the conduct of the Assistant United States Attorney.

At the trial, the defense called Victor Mignoli, who testified in support of Schwartz' contention that he brought Sarkis from Puerto Rico to provide protection for Ebbert. On direct examination by counsel, Mignoli stated that he had told Schwartz that McGee had a gun and would shoot any Gaines employee who sought to repossess his trucks. In connection with the questioning of Mignoli, the defense introduced into evidence a tape recording of a conversation between Mignoli and Jack Taylor, debtors of Gaines. In the course of the conversation, Mignoli described Schwartz as a man of great power who could have Taylor "thrown in the river". Mignoli further stated that Schwartz was "connected with a lot of guineas." Counsel for Schwartz asked Mignoli if he had been referring to "underworld" connections. Mignoli responded that he had not; he simply had in mind Schwartz' business relations with a trucker named Eddie Clarobino.

Upon cross-examination, the prosecutor asked Mignoli what he had meant by use of the phrase, "connected with". Despite repeated questions, the prosecutor could not shake Mignoli's testimony that "connected with" meant "[w]ho [Schwartz] does business with, I guess." The prosecutor, evidently frustrated by Mignoli's apparent prevarication, finally asked: "Isn't it a fact that being connected is common parlance for being connected with the Mafia?" Mignoli stated he had "no idea." Upon defense objection to the form of the prosecutor's question, the Assistant U. S. Attorney simply rephrased his question to ask what Mignoli meant by "connected with". Mignoli failed to answer the question but stated: "Totally untrue." The prosecutor responded, "I know it's totally untrue, but whom did you mean?"

■ Unlike the prosecutorial question containing the word "Mafia" which was the basis for reversal in *United States v. Love*, 534 F.2d 87 (6th Cir. 1976), the prosecutor's question which is here attacked as improper cannot be regarded as containing the implicit, unfounded allegation that Schwartz was associated with organized crime. Indeed, the prosecutor said in so many words that he knew it was "totally untrue" that Schwartz had "Mafia" connections; the

**432**

prosecutor made amply clear that he was inquiring simply as to the meaning which Mignoli intended to convey by use of the "connected with" expression.

In any event, defense counsel had already introduced into evidence the tape which was replete with statements in graphic terms obviously intended by Mignoli to link Schwartz with sinister figures, and defense counsel had inquired of Mignoli whether he had meant to suggest "underworld" connections. The prosecutor simply pressed Mignoli for a more truthful answer. Thus, even if the prosecutor's "Mafia" question might have been inflammatory had it stood by itself, in context it added nothing prejudicial to what the defense had itself presented to the jury. Since the prosecutor's remark could have occasioned no prejudice to the defendants, it was not error.

Affirmed.