UNITED STATES of America, Appellee,

v.

Anthony DiPASQUALE, Appellant
in No. 83–1364,

Appeal of James DiPASQUALE, in
No. 83–1365.

Appeal of August REDDING, aka
"Porky", in No. 83–1367.

Appeal of John SERUBO, in
No. 83–1368.

Appeal of Peter SERUBO, in
No. 83–1369.

Appeal of Victor SZWANKI, in
No. 83–1449.

Nos. 83–1364, 83–1365, 83–1367 to
83–1369 and 83–1449.

United States Court of Appeals,
Third Circuit.

Argued March 1, 1984.

Decided July 31, 1984.

Rehearing and Rehearing In Banc Denied
in Nos. 83–1364, 83–1365, 83–1368,
83–1669 Aug. 28, 1984.

Rehearing and Rehearing In Banc Denied
in No. 83–1449 Sept. 11, 1984.

J. Jeffrey Weisenfeld (argued), Goldberger, Feldman, Dubin & Weisenfeld, New York City, for appellants Anthony DiPasquale and James DiPasquale.

Edward Reif, Philadelphia, Pa., for appellant James DiPasquale.

Jeffrey L. Staniels (argued), Asst. Defender, Joseph M. Miller, Asst. Defender, Defender Association of Philadelphia, Philadelphia, Pa., for appellant August Redding.

Robert A. McAteer (argued), Baratta & Takiff, Philadelphia, Pa., for appellant John Serubo.

John Rogers Carroll (argued), Carroll & Carroll, F. Emmett Fitzpatrick, F. Emmett Fitzpatrick, P.C., Philadelphia, Pa., for appellant Peter Serubo.

Ronald Ervais (argued), Philadelphia, Pa., for appellant Victor Szwanki.

Edward S.G. Dennis, Jr., U.S. Atty., E.D. Pa., Philadelphia, Pa., Brenda Gruss (argued), U.S. Dept. of Justice, Washington, D.C., Ronald G. Cole, Sp. Atty., U.S. Dept. of Justice, Philadelphia, Pa., William C. Bryson, U.S. Dept. of Justice, Washington, D.C., for appellee.

Before SEITZ and GARTH, Circuit Judges, and PORTER, District Judge.*

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The six appellants were convicted and sentenced on one count of conspiracy to collect "claimed debts" by extortionate means in violation of 18 U.S.C. § 894(a). Five of the six were convicted and sentenced on various counts of the underlying substantive offense, also in violation of section 894(a). We have appellate jurisdiction under 28 U.S.C. § 1291.

### I. FACTS

We adopt the district court's comprehensive and detailed narration of the facts, *see*

---

* Honorable David S. Porter, United States District Judge for the Southern District of Ohio, sitting by designation.

*United States v. DiPasquale*, 561 F.Supp. 1338, 1341–46 (E.D.Pa.1983). An abridgment of the district court's presentation follows.

## A. *The Cosmo Incidents.*

1. *September and November 1979.* In 1978 and 1979, Anthony DiPasquale, his brother James, and Michael Cosmo were engaged in the sale of "speed", or methamphetamine. Twice during the autumn of 1979, Anthony, assisted on one occasion by August Redding, forced Cosmo to pay thousands of dollars that Anthony claimed Cosmo owed him. The opinion of the district court, 561 F.Supp. at 1341–42, reflects the details of these first two incidents.

2. *December 1979.* Cosmo worked for a man who installed carpet, and in December 1979, Anthony asked Cosmo and his employer to carpet his basement. Anthony, Redding, and others played cards while Cosmo and his employer worked in Anthony's basement. When Cosmo attempted to leave the house, Redding and Anthony attacked him with fists, feet, and a fireplace poker, until Cosmo lost consciousness. He awoke in the basement, handcuffed to a pinball machine, with Anthony shouting that Cosmo would die. Cosmo agreed to borrow money to pay what Anthony claimed he owed.[1] After Cosmo was taken upstairs, Victor Szwanki punched and tormented him. Cosmo was finally released, and he paid Anthony a few days later, after he obtained the money from his relatives.

Based on this incident, Anthony, Szwanki, and Redding were convicted of collecting a claimed debt by extortionate means.

3. *January 1980.* The following month, Szwanki, James DiPasquale, and two others visited Cosmo at his home. James demanded $25,000 that he claimed Cosmo owed Anthony. When Cosmo denied the debt, James and Szwanki beat and choked him. Although his attackers

warned Cosmo not to contact the police, Cosmo reported the incident at his family's insistence. James called Cosmo and told him he would be killed, but for once Cosmo was fortunate.

## B. *The Kolzer Incident.*

In December 1980, James Kolzer loaned Anthony $10,000 to finance Anthony's manufacture of speed. After they split the proceeds of a subsequent drug sale, Anthony claimed that Kolzer owed him $8,000. Kolzer denied the claim. In February 1981, Redding telephoned Kolzer, told him that he was calling at Anthony's behest, and requested $8,000 to get Anthony out of jail. Kolzer denied any indebtedness to Anthony and refused to pay.

Anthony and Kolzer subsequently discussed undertaking another drug deal, and Anthony arranged to meet Kolzer one night in March 1981. Anthony and Szwanki took Kolzer to Joseph West's auto body shop, where they drew their guns on him. Szwanki bound Kolzer, forced him to kneel, and put a bag over his head. Kolzer was beaten with what he believed to be a pipe. Anthony claimed Kolzer owed him $8,000, but demanded more in return for Kolzer's life. During the balance of the night, Kolzer was hung by a chain hoist, beaten repeatedly, and burned. He made telephone calls in an effort to raise money.

When the torture concluded, Anthony washed and bandaged his victim and had self-developing pictures taken of various combinations of Kolzer, Szwanki, and himself. Szwanki took Kolzer to a bar, where he made more telephone appeals for money. Later, Szwanki accompanied Kolzer to Western Union, where they picked up money that Kolzer had raised. Kolzer and Szwanki proceeded to another bar, where they met Anthony and Kolzer's cousin. The cousin provided additional funds, which were given to Anthony. Kolzer was then allowed to depart.

---

**1.** When Cosmo first related the December 1979 incident, he did not mention that Anthony claimed Cosmo owed him money. Later, however, Cosmo testified that Anthony said on all three occasions in 1979 that Cosmo must pay what he "owed" Anthony. In view of the guilty verdict we must take this later testimony as fact.

Based on this incident, Anthony and Szwanki were convicted on a second count of collecting a claimed debt by extortionate means.

### C. *The Crawford Incident.*

Swain Crawford was a used car salesman at John's Chevrolet, a car dealership owned by John Serubo and perhaps by his father Peter, who was at least associated with the business. On May 9, 1981, Anthony told Crawford to go to John Serubo's office. In the office were Anthony, both Serubos, and another man, described as "burly". Anthony punched Crawford and asked why he had taken money from Peter Serubo. Anthony struck Crawford repeatedly and smashed a bottle over his head. Peter told Crawford that he owed the Serubos $1,800, and when Crawford denied it, Anthony put a gun to Crawford's head. Crawford telephoned a friend, who said she would make arrangements to get the money.

At Anthony's direction, the burly man and defendant Nicholas Fidelibus took Crawford to West's auto body shop. The men described a beating that Anthony had conducted at the garage and said that the victim had been hung from the hoist. Crawford telephoned his friend again, and she offered a diamond ring. After telephoning John Serubo, Fidelibus and Crawford picked up the ring and returned to John's office.

There, Anthony examined the ring and said that if it was worth less than $12,000, it was not worth Crawford's life. Anthony gave the ring to Peter and told Crawford to pay the $1,800 two days later. On the appointed day, Crawford paid the money to the Peter, and John returned the diamond ring. Peter had a check for $200 drawn to Crawford in payment of sales commissions then due. Crawford was required to endorse the check and to give it to John as payment to Anthony for his collection services.

Based on the Crawford incident, Anthony was convicted on a third count of collecting a claimed debt by extortionate means. John Serubo, Peter Serubo, and Nicholas Fidelibus were also convicted on this count. Fidelibus does not appeal.

### D. *The Rosetti Incident and the Courtney Incident. The Conspiracy.*

The district court describes two further incidents, in which Anthony threatened Francis Rosetti and battered Mark Courtney until each agreed to pay money "owed" to the Serubos. *See DiPasquale,* 561 F.Supp. at 1345–46. Victor Szwanki was present during the Courtney incident, and the Serubos participated in both incidents.

Based on the various collection incidents, Anthony DiPasquale, Victor Szwanki, August Redding, James DiPasquale, John Serubo, and Peter Serubo were convicted on one count of conspiring to collect claimed debts by extortionate means. We turn now to the merits of their appeals.

## II. MERITS

### A. *Extensions of Credit.*

Title II of the Consumer Credit Protection Act, codified as chapter 42, 18 U.S.C. §§ 891–896, establishes as federal crimes several types of extortionate credit transactions. The appellants stand convicted under section 894(a), which provides:

> Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
>
> > (1) to collect or attempt to collect any extension of credit, or
> >
> > (2) to punish any person for the non-repayment thereof.
>
> shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

Under the definitional section, "[t]o extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." 18 U.S.C. § 891(1).

Despite this sweeping definition, the appellants contend that the indictment did not charge, the district court did not properly define, and the evidence did not reveal, any extensions of credit. Above all else, the appellants deny that they made loans to their victims or that they agreed to defer the repayment of debts.

1. *Sufficiency of the Indictment.* The district court denied the appellants' pretrial motion to dismiss the indictment, which contains three separate counts that charge "the use of extortionate means ... to collect and attempt to collect a claimed debt ... and to punish [the victim] for the non-repayment thereof." In similar language, the fourth count charges a knowing conspiracy to collect and to attempt to collect claimed debts and to punish victims for the non-repayment of claimed debts. Each count of the indictment states that these are acts in violation of 18 U.S.C. § 894(a). The question is whether the indictment is legally sufficient.

An extension of credit is either a loan or an agreement to defer the repayment or satisfaction of a debt or claim. 18 U.S.C. § 891(1). The debt or claim may be "acknowledged or disputed, valid or invalid". *Id.* It may even be wholly fictitious. *United States v. Cheiman,* 578 F.2d 160, 164 n. 17 (6th Cir.1978), *cert. denied,* 439 U.S. 1068, 99 S.Ct. 834, 59 L.Ed.2d 33 (1979); *United States v. Nace,* 561 F.2d 763, 770 (9th Cir.1977); *cf. United States v. Totaro,* 550 F.2d 957, 958–59 (4th Cir.) (promised loan never received), *cert. denied,* 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977).

Furthermore, the agreement [2] to defer repayment may be "tacit or express". 18 U.S.C. § 891(1). A tacit agreement may be implied from the circumstances surrounding the creation of the debt. For example, in *United States v. Mase,* 556 F.2d 671 (2d Cir.1977), *cert. denied,* 435 U.S. 916, 98 S.Ct. 1472, 55 L.Ed.2d 508 (1978), the court held that the placing of a bet evidenced "a simultaneous agreement to defer repayment" of the debt that would accrue when one party or the other lost the bet.[3] *Id.* at 674; *see also United States v. Czarnecki,* 552 F.2d 698, 703 (6th Cir.), *cert. denied,* 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977). Similarly, in *United States v. Horton,* 676 F.2d 1165, 1171–72 (7th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983), the court suggested that there was an extension of credit to one Conkrite because Conkrite owed the defendant money in connection with a drug sale, *see id.* at 1172.[4]

We conclude that under section 891(1), an agreement to defer the repayment of a debt may be implied from the debt, even if the debt is wholly fictitious. When a self-styled creditor appears before his "debtor" and demands satisfaction, the creditor posits both a debt and the prior deferral of its repayment. We believe that the definition of an extension of credit encompasses this type of transaction, which the indictment before us accurately describes as the collection of a claimed debt.

The appellants rely heavily on *United States v. Boulahanis,* 677 F.2d 586, 590–91 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), in which the court held that neither a debt nor cir-

---

**2.** The term "agreement" has not been strictly construed. *See United States v. Bufalino,* 576 F.2d 446, 452 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) (debtor may be swindler who never intended to repay loss); *Czarnecki,* 552 F.2d at 703 (extension of credit does not require bilateral agreement, supported by consideration, to defer for a specific period the payment of a "definite" debt).

**3.** The *Mase* court noted that because bettors must often pay when they bet, not every bet includes an agreement to defer repayment.

**4.** The defendant in *Horton* also extended credit to Cronkite's partner, Hardy, by giving Hardy time to honor a bad check. *Id.* at 1171–72. There was evidence that Cronkite was responsible for Hardy's debt as well as his own. *Id.* at 1172. This may explain why the court in *United States v. Boulahanis,* 677 F.2d 586, 590 (7th Cir.), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), cited *Horton* as an example of an explicit deferral of repayment.

cumstantial evidence of an agreement to defer repayment of a debt is sufficient to prove an extension of credit. Citing *Boulahanis*, the appellants argue that we must not construe the definition of an extension of credit to include claimed debts.

Congress explicitly intended that chapter 42 be wielded with "vigor and imagination". Conf.Rep. No. 1397, 90th Cong., 2d Sess. 31, *reprinted in* 1968 U.S.Code Cong. & Ad.News 1962, 2029. Specifically, Congress intended that chapter 42 reach transactions that are, by their nature, difficult to prove. Congress knew that extortionate credit transactions are characterized by "the unwritten word, the silent threat." 114 Cong.Rec. 1608 (1968) (remarks of Rep. Widnall). President Ford, then a congressman, demonstrated that the difficulty of proving extortionate credit transactions effectively exempted them from the antiracketeering statutes. *See* House Republican Task Force on Crime, *id.* at 14105; *see also* Pub.L. 90–321, tit. II, § 201(a), 82 Stat. 146, 159 (congressional findings).

■ The definition of an extension of credit in section 891(1) was generously drafted. The definition has been even more generously construed. Only the *Boulahanis* court has constrained the scope of chapter 42. We decline to follow *Boulahanis* because we believe that its construction is inconsistent with the language and purpose of chapter 42. We conclude that a claimed debt is one type of extension of credit under section 891(1). The indictment was therefore sufficient under 18 U.S.C. § 894(a).

■ 2. *The Jury Instructions and the Evidence.* The appellants contend that the district court erred when it charged the jury as to the possibly fictitious nature of the claimed debts. As we have already noted, claimed debts may be fictitious; thus, the instruction was not incorrect. Nor did the court err when it instructed that "the claim could be based on the assertion that money had been stolen [or] that money was due for the delivery of drugs which had not been paid for." A debt or claim may arise from any source, by any

means. *See, e.g., Horton*, 676 F.2d at 1172 (drug sale); *United States v. Annerino*, 495 F.2d 1159, 1166 (7th Cir.1974) (unauthorized use of credit cards and misappropriation of funds); *see also* 18 U.S.C. § 891(1) ("any debt ... however arising").

■ The district court also instructed that the elements of a crime under section 894 were "violence, a claim of indebtedness and an agreement to accept payment at another time." *See DiPasquale*, 561 F.Supp. at 1356. This instruction required the government to prove more than was necessary to obtain a conviction, because it separated the claimed debt from the agreement to defer repayment. Although a claimed debt plus an independent agreement to defer repayment is one type of extension of credit, *see, e.g., United States v. Keresty*, 465 F.2d 36, 39 (3d Cir.), *cert. denied*, 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (1972), it is not the type charged in the indictment.

Citing *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the appellants argue that this variance requires reversal. The indictment in *Stirone* predicated an essential element of a crime on the fact that the victim imported sand from another state, but the district court charged that the essential element could be proved either by the victim's importation of sand *or* by his planned future exportation of steel. *See id.* at 214, 80 S.Ct. at 271. Reversing Stirone's conviction, the Supreme Court held that "it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned." *Id.* at 217, 80 S.Ct. at 273.

The appellants' invocation of *Stirone* is not persuasive. Although the district court required proof of more than the indictment charged, we can say with certainty that if the jury found a claimed debt *and* an independent agreement to defer repayment, it found a claimed debt. "[I]f the indictment is sufficient, evidence which meets its allegations and proves something more with-

out proving an offense different from that which is charged, cannot make a variance between the probata and the allegata." *Goldberger v. United States*, 4 F.2d 10, 12 (3d Cir.1925).

The district court told the jury that the "violence, a claim of indebtedness, and an agreement to accept payment at another time" could occur in any sequence on a particular occasion. *See DiPasquale*, 561 F.Supp. at 1356. The appellants argue that if the use of extortionate means antedates the extension of credit, there is no violation of section 894, although there may be an extortionate extension of credit [5] in violation of section 892.

Given the district court's instruction, the jury could have found that violence preceded or followed "a claim of indebtedness". A claim of indebtedness is not itself the claimed debt. Whether the claimed debts in this case were fictitious or real, each was claimed to have arisen prior to its extortionate collection. Thus, the extensions of credit were posited as having occurred in the past, before the use of violent means to collect them. We need not decide whether this sequence is essential to a violation under section 894.[6]

 Finally, the appellants argue that the district court erred when it said that the essence of the crime is extortion. While this may be an incomplete description of a crime under section 894, any harm it might have caused was forestalled by the court's repeated explanation that a violation under section 894 requires a claim of indebtedness.

B. *Single Conspiracy or Multiple Conspiracies.*

 1. *The Jury Instructions.* The appellants contend that the district court misstated the law in its instructions to the jury on the conspiracy count. The district court said, in part, "[i]f the Government hasn't proven the overall conspiracy charged ... no one can be found guilty [on the conspiracy count]." The appellants note the similarity between this instruction and the "all or nothing" charge that was fatal in *United States v. Kelly*, 349 F.2d 720, 757 (2d Cir.1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). The *Kelly* court held that the all or nothing charge erroneously suggested that the jury could not find any of the defendants guilty of the single conspiracy charged unless it found all of them guilty. The government protests that the appellants failed to raise this issue at trial. We shall assume without deciding that the issue is properly before us.

The government argues that taken in their entirety, the district court's instructions on the conspiracy count were correct. In addition to its potentially misleading language, the court instructed that if the jury found that there was a unitary conspiracy, it could then convict any defendant found to have joined that conspiracy. This part of the charge clearly separates proof of the conspiracy from proof of each defendant's participation in the conspiracy, as in *United States v. Bynum*, 485 F.2d 490, 497–98 (2d Cir.1973), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974).

During their deliberations, however, the jurors sent a note to the court which read in part, "On [the conspiracy count], all must be guilty or none." We conclude that the district court's initial instructions on the issue of conspiracy confused the jury. *See Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) (jury question indicates confusion).

---

**5.** An extortionate extension of credit is:
 any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.

18 U.S.C. § 891(6).

**6.** We note, however, that in *United States v. Briola*, 465 F.2d 1018 (10th Cir.1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973), the court rejected an argument similar to the appellants. *See id.* at 1021–22.

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach*, 326 U.S. at 612–13, 66 S.Ct. at 405. Without objection from counsel, the district court gave further instructions to the jury that adequately explained the distinction between proof of the conspiracy charged and proof of its membership. We believe that the district court, unlike the trial court in *Bollenbach*, remedied the jury's confusion and enabled them to reach a legally correct verdict on the conspiracy count.[7]

2. *Variance of Proof.* Although Anthony DiPasquale directed and participated in every incident but one, the Cosmo and Kolzer incidents were collections on behalf of Anthony from associates in his drug transactions, and the Crawford, Rosetti, and Courtney incidents were collections on behalf of the Serubos from persons who worked for or did business with John's Chevrolet. The appellants therefore argue that although the indictment charged a single conspiracy, the evidence proved at least two separate conspiracies. The appellants also suggest that the lapse of time between the Cosmo and Kolzer incidents subdivided the collections on Anthony's behalf into two distinct conspiracies. Such variances of proof, if prejudicial, would be grounds for reversal. *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946); *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

The district court meticulously detailed the similarity of method and result, and the partial overlap of participants, in the various incidents. *See DiPasquale*, 561 F.Supp. at 1350–52. We agree that this evidence is probative of a unitary conspiracy, and we have relied on it in our review. The similarity of the various incidents, however, is not inconsistent with "separate adventures of like character," *Kotteakos*,

328 U.S. at 769, 66 S.Ct. at 1250, *quoted in United States v. Jackson*, 696 F.2d 578, 583 (8th Cir.1982), *cert. denied*, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983).[8]

We are not persuaded by the appellants' attempt to subdivide the collections on Anthony's behalf into two chronologically distinct conspiracies. A conspiracy terminates when its "principal purposes" have been accomplished. *United States v. Steele*, 685 F.2d 793, 801 (3d Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982); *United States v. Mayes*, 512 F.2d 637, 642 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670, 423 U.S. 840, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975). The extortionate collections of claimed debts arising out of Anthony's drug transactions demonstrated "a continuity of purpose and a continued performance of acts", *id.*, and the lapse of a year's time between the Cosmo incidents and the Kolzer incident is not sufficient to prove that there were two similar but separate agreements.

The distinction between the collections on Anthony's behalf and the collections on behalf of the Serubos presents a closer question. In *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the owner of some whiskey entered into an agreement with Goldsmith and Weiss to sell the whiskey illegally, and these two used three others as intermediaries. The Court acknowledged that "in a hypertechnical aspect," the evidence showed one agreement between the owner, Goldsmith, and Weiss, and a separate agreement between Goldsmith, Weiss, and their three intermediaries. *Id.* at 556, 68 S.Ct. at 256. Nevertheless, the Court concluded that there was one overall conspiracy, evidenced by the intermediaries' awareness that their transactions were part of a larger scheme, which encompassed two interdependent subplots.

---

7. The government points out that if the harm envisioned by the *Kelly* court had occurred, the jury would not have acquitted defendants Neil Ferber and Nicholas Fidelibus on the conspiracy count.

8. We do not agree with the appellants' contention that in its charge to the jury, the district court focused too heavily on the similarity of the incidents.

*See id.* at 555 n. 14, 556, 558–59, 68 S.Ct. at 255 n. 14, 256, 257.

There is sufficient evidence to support the jury's conclusion that the Serubos were aware that the collections in which they participated were part of a larger, ongoing scheme to collect claimed debts by extortionate means. The Serubos described Anthony as the man who took care of their "problems", and they concede that the evidence showed that Anthony helped them collect their "debts". The Serubos deny knowledge of the Cosmo or Kolzer incidents, but there is considerable circumstantial evidence to the contrary.

Anthony introduced the Serubos to Joseph West in February 1981. Although West testified that the purpose of the meeting was to arrange for the Serubos to send work to West's garage, the meeting establishes that there was a connection between Anthony, the Serubos, and West before the last collection incident involving payments to Anthony. During that last incident, while Kolzer was still held captive, Anthony visited John's Chevrolet.

In the first incident involving payments to the Serubos, Crawford, the victim, was taken from John's Chevrolet to West's garage. Crawford testified that Anthony, in Peter Serubo's presence, ordered someone to take Crawford to "the garage". Joseph West, who was also present, testified that the Serubos suggested that Crawford be taken to "the garage" and hung on a hook, reminiscent of the Kolzer incident. There was also testimony that suggests that Anthony publicized his exploits among his associates.

Given this evidence, it is very unlikely that the Serubos were unaware of Anthony's collection scheme. The appellants argue, however, that because the success of the collections on behalf of the Serubos was not, strictly speaking, dependent on the success of the collections on behalf of Anthony, the two schemes lack the interdependency that was essential to the outcome in *Blumenthal.*

We recognize that in many cases, courts, including our own, have pointed out the interdependency of component agreements in a larger conspiracy. *See, e.g., United States v. Kenny,* 462 F.2d 1205, 1217 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). Interdependency, however, is simply "evidence of an agreement". *United States v. Taylor,* 562 F.2d 1345, 1352 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). It is not an element of the offense. *United States v. Shoup,* 608 F.2d 950, 957 n. 12 (3d Cir.1979); *cf. United States v. Rush,* 666 F.2d 10, 12 (2d Cir.1981) (court need not instruct jury to apply " 'stake in the interest' test").

Even the pooling of resources "can betoken the interlocking interests of the alleged co-conspirators, supporting the inferences of knowledge and dependency." *United States v. Barnes,* 604 F.2d 121, 155 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Collections on behalf of the Serubos and collections on Anthony's behalf involved the use of common resources, including Joseph West's garage. In addition, participants in the Crawford incident used stories of Anthony's past collections to help persuade Crawford to pay money to the Serubos. By contrast, in cases on which the appellants rely, there was virtually no evidence to connect parallel but distinct schemes. For example, in *Jackson, supra,* the use of a common arsonist was the only persuasive evidence to connect two sets of fires. *See also United States v. Snider,* 720 F.2d 985, 989 (8th Cir.1983); *United States v. Camiel,* 689 F.2d 31, 36–37 & n. 3 (3d Cir.1982).

We agree that those convicted of conspiracy must not only be aware of another person's illegal scheme, but "must in some sense promote [the] venture himself, make it his own, have a stake in its outcome." *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir.1940) (Judge Learned Hand writing for the court), *aff'd,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). In *United States v. Varelli,* 407 F.2d 735 (7th Cir.1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972), those who participated in only one of the core

conspirators' numerous hijackings had no interest in the establishment or maintenance of a continuing conspiracy to hijack trucks. *See id.* at 744. By contrast, the Serubos were interested in and dependent upon the continuing conspiracy in which they participated.

■ Whether there was one conspiracy is a question of fact, and our only task is to ascertain whether the evidence, taken in the light most favorable to the government, supports the jury's finding that there was a single conspiracy. *United States v. Brooks,* 697 F.2d 517, 523 (3d Cir.1982), *cert. denied,* 460 U.S. 1071, 1073, 103 S.Ct. 1526, 1531, 75 L.Ed.2d 949, 952 (1983). We conclude that there was sufficient evidence to support the jury's finding of a single conspiracy to collect claimed debts by extortionate means.[9]

### C. *James DiPasquale's Membership in the Conspiracy.*

■ James DiPasquale argues that there was insufficient evidence to support the jury's conclusion that he was a member of the conspiracy to collect claimed debts by extortionate means. James contends that his membership cannot be predicated on a single incident. *See, e.g., United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir.1971). The *DeNoia* court, however, would not apply its "single transaction" rule where there is "independent evidence tending to prove that the defendant in question had some knowledge of the broader conspiracy, or the single act itself [is] one from which such knowledge may be inferred." *Id.; cf. Direct Sales Company v. United States,* 319 U.S. 703, 712 n. 8, 63 S.Ct. 1265, 1269 n. 8, 87 L.Ed. 1674 (1943) (if a seller is "indifferent" to a buyer's illegal purpose, "single or casual transac-

tions" may not demonstrate a conspiracy between the buyer and the seller).

This accords with our rule that, "[a]t a minimum, ... it must be shown that ... a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose." *United States v. Klein,* 515 F.2d 751, 753 (3d Cir. 1975). The question is whether there was sufficient evidence for the jury to find that James was aware of the nature of the conspiracy when he acted in furtherance of it.

The incident in which James was involved was substantially similar to other incidents in furtherance of the conspiracy. James, with Victor Szwanki and two others, visited Cosmo in January 1980, attacked him, and demanded money that James said Cosmo owed Anthony. James also threatened to kill Cosmo. James protests that the purpose of his visit was not the same as the purpose of the other incidents because he brutalized Cosmo to help his brother, who was in jail at the time. This contention is not inconsistent with the fact that James beat up Cosmo in an attempt to collect a "debt" owed to Anthony. Although James's participation in the scheme was limited, he adopted both its methods and its goals in his attack on Cosmo.[10]

In addition to the evidence of the attack on Cosmo, there was testimony from an undercover detective that after James was indicted for conspiracy, James said, "I got arrested and I'm going to court, but don't worry. There's nine people involved and by the time this thing comes to court the witnesses might fall down steps and break their fucking heads open." This testimony was admitted to show James's consciousness of guilt. *See DiPasquale,* 561 F.Supp. at 1353–54 & n. 20.

---

9. This conclusion precludes August Redding's argument that he had nothing to do with the collections on behalf of the Serubos and James DiPasquale's argument that the Rosetti and Courtney incidents were not part of the conspiracy with which James was involved.

10. James argues that his participation in the conspiracy terminated with the Cosmo inci-

dents, but he offered no evidence of his affirmative withdrawl from the conspiracy or of his repudiation of its purposes. *See, e.g., Steele,* 685 F.2d at 803–04. At any rate, the possibility that James may have left the conspiracy has no bearing on his conviction for having been a member.

The evidence against James was sufficient to support the jury's verdict. To borrow a metaphor from another court, even the cymbalist is part of the orchestra. *See United States v. Armedo-Sarmiento*, 545 F.2d 785, 794 (2d Cir.1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

### D. *Anthony DiPasquale's Speedy Trial Act Claim.*

Anthony DiPasquale contends that the district court erred in denying his motion for dismissal under the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1976 & Supp. III). "Section 3161(c) mandates dismissal if trial does not commence within 70 days of the later of the filing of the indictment or the defendant's first appearance before a judicial officer of the court in which such charges are pending, unless the excess days can be excluded under section 3161(h)." *United States v. Novak*, 715 F.2d 810, 812 (3d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

The seventy-day period to trial began to run when Anthony was arraigned. *See United States v. Carrasquillo*, 667 F.2d 382, 384 (3d Cir.1981). Considerably less than seventy days after Anthony's arraignment, John and Peter Serubo filed a notice of appeal from the disqualification of their counsel.[11] Anthony's counsel conceded in his oral argument to this court that the time during the pendency of the Serubos' interlocutory appeal was excludable from Anthony's seventy-day period to trial. *See* 18 U.S.C. §§ 3161(h)(1)(E) (exclusion for interlocutory appeals), 3161(h)(7) (exclusion based on a codefendant's exclusion); *see also Novak*, 715 F.2d at 814–15.

The interlocutory appeal was still pending on July 2, 1982, when Anthony filed his motion to dismiss under the Speedy Trial Act. Therefore, there was no violation of

the Act when Anthony filed his motion to dismiss. Subsequent delays are not at issue. *See Novak*, 715 F.2d at 821. We conclude that the district court correctly denied Anthony's motion to dismiss.[12]

### E. *Motions for Severance.*

Peter Serubo, John Serubo, Victor Szwanki, and James DiPasquale argue that the district court abused its discretion when it denied their motions for severance. As the appellants recognize, they bear a "heavy burden" when they protest a refusal to sever. *E.g. United States v. Boyd*, 595 F.2d 120, 125 (3d Cir.1978). Insofar as these motions were based on contentions that there were multiple conspiracies, they were properly denied. *See, e.g., id.*

Victor Szwanki argues that because the district court denied his motion for severance, he was denied a speedy trial and was prejudiced by the admission of certain evidence. The district court correctly denied Szwanki's pretrial motion to dismiss the indictment for an undue delay in prosecution. We address Szwanki's evidentiary arguments in the next section of this opinion.

James DiPasquale argues that he should have been tried separately because only a relatively small amount of the evidence presented described his activities. We have held that "[a] defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than against him." *United States v. Dansker*, 537 F.2d 40, 62 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Some courts consider a disparity in the weight or quantity of the evidence to be one factor in the review of a denial of severance, but they will not require reversal on this ground unless there are exacerabating circumstances. *E.g. United States v. Bruner*, 657 F.2d 1278, 1290 (D.C.Cir.1981).

**11.** The Supreme Court has subsequently held that such disqualifications are not immediately appealable. *See Flanagan v. United States*, — U.S. —, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984).

**12.** Anthony makes several arguments in opposition to the government's exclusion of certain amounts of time for various pretrial motions under 18 U.S.C. § 3161(h)(1)(F). Given our disposition of the issue, we need not address the question of pretrial motion exclusions.

James also protests that being tried with his brother increased the risk of prejudice, as in *United States v. Sampol*, 636 F.2d 621, 647 (D.C.Cir.1980). In *Sampol*, however, there was a massive failure to segregate the evidence, and "the confusion was so great" that a witness who described a meeting with one brother misidentified him as the other brother. *Id.; see DiPasquale*, 561 F.Supp. at 1346–47 n. 15.

Our fundamental concern is whether joinder unfairly prejudiced the jury against a particular defendant. *See, e.g., United States v. Mardian*, 546 F.2d 973, 979 (D.C. Cir.1976). We must determine whether the jury could reasonably be expected to "compartmentalize" the evidence against the various defendants and to "consider it for its proper purposes", *Dansker*, 537 F.2d at 62; *see also, e.g., Boyd*, 595 F.2d at 125.

The proceedings on review do not reveal the chaos of *Sampol* or the multiple handicaps that befell the defendant in *Mardian*. James is Anthony's brother, and James played a comparatively small part in the conspiracy. Any serious prejudice that these facts might have engendered was averted by the government's well-ordered presentation of its case, *see DiPasquale*, 561 F.Supp. at 1348, and by the trial court's repeated instructions to the jury to consider the evidence against each defendant. Given that the government has a legitimate interest in trying coconspirators together, *see, e.g., Boyd*, 595 F.2d at 125, we cannot say that the district court abused its discretion in denying James's motion for severance.[13]

### F. *Evidentiary Rulings.*

1. *The Rosetti and Courtney Incidents.* The appellants argue that evidence of the Rosetti and Courtney incidents was improperly admitted. The appellants concede that the conspiracy described in the indictment was of sufficient duration to include the Rosetti and Courtney incidents, but they argue that in fact the conspiracy

terminated sooner. There is no evidence that the conspiracy terminated before the date of the indictment, and we cannot ignore the grand jury's charge that the conspiracy was still in existence on that date. The appellants' reliance on *Boyd*, 595 F.2d at 125–27, is misplaced because the evidence introduced in *Boyd* described events that occurred after the termination date charged in the indictment.

The indictment, however, made no mention of the rosetti and courtney incidents. We have held that "when an overt act in furtherance of a conspiracy proven at trial differs from any of the overt acts alleged in the indictment", this variance is permissible unless it deprives the defendant of fair notice or puts him in danger of double jeopardy. *United States v. Adamo*, 534 F.2d 31, 39 (3d Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). The appellants claim that they had insufficient notice that Courtney and Rosetti would testify. Generally speaking, surprise is not a ground for the exclusion of evidence in a criminal trial. 1 *Weinstein's Evidence* ¶ 403[1] at 403–12 to –14, ¶ 403[6] at 403–60 (1982). Nor is the government "required to divulge the identity of its witnesses in a noncapital case." *United States v. Addonizio*, 451 F.2d 49, 62 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Furthermore, the district court determined that the appellants were not prejudiced by the government's failure to disclose pretrial that it would offer evidence of the Rosetti and Courtney incidents. *See DiPasquale*, 561 F.Supp. at 1354 n. 22. We agree.

The appellants also argue that no extortionate means were used in the Rosetti incident. We reject this argument for the reasons given by the district court, *see id.* at 1355.

2. *Evidence of Incarceration and of Prior Criminal Activities.* Victor Szwanki protests the admission of evidence

---

**13.** Defendants other than James moved for severance at trial because they feared that the evidence against Anthony would be unfairly preju-

dicial. The district court did not abuse its discretion in denying these motions.

that "one of the Defendants was in jail." This appears to be a reference to testimony that in January 1980, James DiPasquale told Cosmo, and August Redding told Kolzer, that Anthony needed money to get out of jail. Szwanki suggests that this evidence was prejudicial hearsay. It does not appear that the testimony was challenged at trial as hearsay. We will therefore not consider that issue on appeal. As to the objection of prejudice, the government argued at trial that this testimony gave credibility to the demand for money, and the district court ruled that the evidence was more probative than prejudicial. *See DiPasquale*, 561 F.Supp. at 1343 n. 6. Such balancing is the province of the trial court, *see United States v. Catalano*, 491 F.2d 268, 274 (2d Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974), and the court did not abuse its discretion here.

Szwanki also protests the admission of evidence of prior criminal activities, apparently in reference to the testimony of Cosmo and Kolzer that each participated in drug deals with Anthony. The district court admitted the evidence under Fed.R. Evid. 404(b) and ruled that it was more probative than prejudicial. *See id.* 561 F.Supp. at 1352. Again, the district court did not abuse its discretion.

### G. *Prosecutorial Misconduct.*

We turn now to an exchange of invective between counsel for Anthony DiPasquale, counsel for John Serubo, and one of the prosecutors. In his closing argument, Anthony's attorney described a witness immunity agreement as follows. "[T]he agreement if [sic] very simple: 'Say what we want to hear.'" Anthony's attorney continued:

A script. It's an absolute script directed by the Government. You have been invited to a play.

. . . .

... They said to Kolzer, "What is important is 'owe money.' This is what you have to say because we've got to search through our little book here and find out what the federal crime could be. [sic]

Anthony's attorney repeated these insinuations and accusations throughout his summation.

John Serubo's attorney rose to echo his colleague's attack: "[The witness] made a deal with the Government and it was after that deal was consummated that he said he would testify for the Government on behalf of the Government and the way the Government wished him to testify." Describing the testimony of another witness, John's attorney said, "Only parts of his testimony were fabricated, and I suggest to you he had help. He didn't do it alone." And later, "What were the untruths? What had to be weaved [sic] into that truthful scenario by whomever it was that helped him to put it together?"

The prosecutor, in his own words, "was itching for the opportunity to respond", and when the opportunity appeared, he seized it.

[Counsel for Anthony and counsel for John] accused [the FBI agent, another prosecutor] and me of something that's very serious. . . .

Now I'm making a proposition to you because I'm absolutely confident of what your choice will be. If you think that [the FBI agent or the other prosecutor] or I is capable of [subornation of perjury] to convict these defendants, then it should take you about five minutes to acquit every one of them.

The prosecutor then made several intermittent comments to the effect that if he had schooled the witnesses, he would not have been so stupid as to tell them to testify as they did. The prosecutor reviewed the remaining evidence without further interjections, until he reached his last words to the jury.

I ask you to return not only a verdict of guilty but a swift verdict, a verdict that will tell these defendants, "We do not condone what you did," and a swift verdict will tell [counsel for Anthony and counsel for John], "We don't agree with your allegations of misconduct by [the FBI agent, the co-prosecutor] and me."

■ Unless it would be plain error not to order a new trial based on prosecutorial misconduct, the failure to object at trial to a prosecutor's remarks is fatal. *United States v. Somers*, 496 F.2d 723, 742 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Kravitz*, 281 F.2d 581, 587 & n. 10 (3d Cir.1960), *cert. denied*, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961). Although the appellants asserted prosecutorial misconduct in support of their post-trial motions for acquittal or a new trial, not all of the appellants protested the prosecutor's summation at trial. We must therefore review the appellants' arguments under two different standards.

1. *Anthony and the Serubos.* Peter Serubo claims that he objected to the prosecutor's summation at trial, but he does not cite the record, and we can find no trace of his objection or of a similar objection by John Serubo or by Anthony DiPasquale. We review for plain error.

Time and again, we have emphasized that a prosecutor bears a special responsibility not to abuse the prestige that accrues to his office. *See United States v. Gallagher*, 576 F.2d 1028, 1042–43 (3d Cir. 1978), *cert. dismissed*, 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980); *Somers*, 496 F.2d at 742; *Kravitz*, 281 F.2d 581, 587; *see also, e.g., Berger*, 295 U.S. at 88, 55 S.Ct. at 633 (1935); *see generally United States v. Modica*, 663 F.2d 1173, 1178–86 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). On the other hand, the principle of prosecutorial restraint does not free a defense attorney to argue with impunity that the government wrote and directed a play.

■ Here, a fair reading of the prosecutor's remarks leads us to conclude that "the prosecution was only meeting the defense on a level of the defense's own choosing." *United States v. LaSorsa*, 480 F.2d 522, 526 (2d Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); *see also, e.g., Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958); *United States v.*

*West*, 670 F.2d 675, 689 (7th Cir.), *cert. denied*, 457 U.S. 1124, 1139, 102 S.Ct. 2944, 2972, 73 L.Ed.2d 1340, 1359 (1982); *United States v. Praetorius*, 622 F.2d 1054, 1060–61 (2d Cir.), *cert. denied sub nom. Lebel v. United States*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980); *Somers*, 496 F.2d at 741. *But see United States v. Young*, 736 F.2d 565 at 570 (10th Cir.1983) (per curiam opinion rejecting reply doctrine), *cert. granted*, — U.S. —, 104 S.Ct. 1271, 79 L.Ed.2d 676 (1984). John Serubo claims that the prosecutor's remarks were unprovoked. We disagree.

Nevertheless, there are limits to what the "reply doctrine" authorizes a prosecutor to say. As we held in *Somers*, "[t]he doctrine serves to permit neutralization of improper defense arguments; it does not operate as a license for improper affirmative attacks upon defendants." 496 F.2d at 741. Although the prosecutor's remark in *Somers* was "causally related" to the defense counsel's accusation, *id.* at 741, it was not directly responsive to it, but used the accusation as a springboard to suggest that the prosecution had undisclosed evidence that established the defendant's guilt.

By contrast, the prosecutor's remarks in this case, although rhetorically phrased, were essentially a denial of the defense counsel's accusation that the government wrote its witnesses' testimony. We cannot say that it was plain error for the district court to deny Anthony's and the Serubos' motions for a new trial based on the prosecutor's summation.

The Supreme Court has recently emphasized the importance of the harmless error doctrine in determining the consequences of prosecutorial misconduct. *See United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). We hold that even if there was error, it was harmless because there was no substantial prejudice to Anthony or the Serubos. Specifically, the prosecutor's statements, which can impliedly be taken as seeking to vindicate his own credibility, did not permeate the three-

week trial; the trial court took curative measures in its charge to the jury;[14] and the case against Anthony and the Serubos was strong. *See Modica,* 663 F.2d at 1181; *Gallagher,* 576 F.2d at 1042.

2. *James, Redding, and Szwanki.* When the prosecutor completed his summation, defendants including James DiPasquale immediately protested and were soon joined by August Redding and Victor Szwanki. These appellants did not argue that the prosecutor's closing was an improper response to the attack by counsel for Anthony and counsel for John Serubo. Rather, they moved for severance, arguing that they had been prejudiced by inflammatory remarks that they did not provoke. We must determine whether the prosecutor's remarks deprived James, Redding, and Szwanki of a fair trial. *See, e.g., Somers,* 496 F.2d at 736–37.

The government argues that because the prosecutor specifically addressed his response to counsel for Anthony and to counsel for John Serubo, his remarks could not have prejudiced the jury against James, Redding, or Szwanki. *See id.* at 739–40 n. 32. We are not satisfied that the prosecutor's remarks were as insular as the government contends. The question is whether they were sufficiently prejudicial to have turned the jury against James, Redding, and Szwanki.

▉ We have already noted that the statements of the prosecutor were limited to one instance in the course of a three week trial and that the court issued curative instructions. To this we add that the government had a strong case against Szwanki and Redding, both of whom re-

peatedly and actively participated in the extortionate collections. *See Berger,* 295 U.S. at 88, 55 S.Ct. at 633. The evidence against James was not as strong. Nevertheless, we do not believe that the prosecutor's remarks, taken in context of the trial as a whole, were sufficiently prejudicial to have deprived James of his right to a fair trial. We conclude that the district court did not commit reversible error in refusing to disturb James' conviction, or the convictions of Redding and Szwanki, on this ground.

We take occasion, once again, to remind the district courts of their responsibility to forestall unfair provocation and to constrain prosecutorial misconduct. *See United States v. LeFevre,* 483 F.2d 477, 480 (3d Cir.1973); *United States v. Sigal,* 341 F.2d 837, 845 (3d Cir), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Where there is blatant deviation from acceptable standards, prompt intervention by the district court is clearly in order.

## IV.

The judgment of the district court will be affirmed.

---

**14.** The trial court cautioned the jurors not to be prejudiced by the fact that the United States government was prosecuting the case and reminded them to base their verdicts solely on the evidence. The court concluded its charge with a direct comment on the prosecutor's summation:

> It was suggested during [the prosecutor's] argument or his rebuttal to you that you should return a prompt verdict. I am not

setting any time limit on your deliberations. If you are convinced beyond a reasonable doubt as to the guilt of a defendant you may return a prompt verdict, but you should not return prompt verdicts just for the purpose of getting your job over with. You have to decide important questions that affect the lives of each of these persons and you are to take the time that the importance and scope of your deliberations demand and require.