**UNITED STATES of America,**
**Plaintiff-Appellee,**
v.
**Nick BOULAHANIS and Donald Scalise,**
**Defendants-Appellants.**

**No. 81–1405.**

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1982.

Decided May 6, 1982.

Rehearing and Rehearing En Banc
Denied June 15, 1982.

Allan A. Ackerman, Ackerman & Egan, Ltd., Chicago, Ill., Robert S. Bailey, Chicago, Ill., for defendants-appellants.

Louis M. Fischer, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before ESCHBACH, Circuit Judge, NICHOLS, Associate Judge,* and POSNER, Circuit Judge.

POSNER, Circuit Judge.

Nick Boulahanis and Donald Scalise appeal from their conviction on one count of violating the Hobbs Act, 18 U.S.C. § 1951, and one count of violating 18 U.S.C. § 894 (extortionate collection of extensions of credit).

Nick Velentzas owned the Hellenic Social Club in Chicago. Men, mostly of Greek extraction, would come there to talk, drink coffee, play cards, and shoot dice—and gamble. One night the appellants showed up in the company of Frank Renella. They proceeded to beat up Velentzas, and one of the appellants also smashed a lot of furniture. Velentzas went the next day to the FBI, who equipped him with a recording device which he strapped to his ankle. That night the appellants and Renella reappeared and had a conversation with Velentzas (outside the club) that was taped by the recording device. In this conversation, which was played to the jury, the appellants and Renella told Velentzas in language free from any shade of ambiguity that if he did not pay them $300 for the past month and $500 per month thereafter for allowing gambling in the club they would shut it down, while if he did pay they would not only "terrorize nobody more in here" but would beat up anyone else who was trying to extort money from Velentzas.

Several days later, Renella turned himself in to the FBI and made statements incriminating himself and one of the appellants. He was indicted along with both appellants and all three were scheduled to be tried together. Prior to trial Renella moved to suppress his statements and at the suppression hearing it emerged that he was a former FBI informant. Shortly after this bombshell exploded, Renella disappeared. The appellants moved to sever his trial from theirs. The government opposed the motion; it wanted to try Renella *in absentia* along with the appellants. Before acting on the motion the court conducted a hearing into the circumstances of Renella's employment as a government informant. The hearing revealed that Renella had been dropped as an informant three years earlier (though without being told of the fact). Since then he had had intermittent contacts with the FBI, culminating in the meeting in which he turned himself in, but he had not returned to the government payroll or passed information to the government beyond what anyone who found himself in a criminal scrape might pass in an effort to get more lenient treatment for himself. He had not given the government any information about the appellants' defense tactics or planning.

The district court granted the motion to sever Renella's trial from the appellants' and also the motion to suppress Renella's statements. The appellants argue that this was not good enough; that the planting of a government informant in the defense camp was so reprehensible that nothing short of dismissal of the case with prejudice will remove this ugly stain from

* Of the United States Court of Claims.

the Justice Department's escutcheon. We disagree with this characterization of the government's conduct. Hiring a criminal as an informant does not create an indissoluble lifetime bond between him and the government. When Renella ceased to be an informant the government could treat him like any other criminal, and indict and try him with his confederates if that was otherwise the proper procedure in the circumstances. Of course if while under indictment Renella had decided to try to revive his relationship with the FBI and had come to them with an offer to spy on his codefendants in exchange for money or leniency, the FBI would have been guilty of serious misconduct in accepting the offer. Since there is no evidence this happened, we need not speculate on what (if any) further sanction for such misconduct would be appropriate, beyond suppression of the fruits of the improper spying.

■ Another procedural issue has to do with the admission into evidence at the appellants' trial of the grand jury testimony of James Chiampas, who was present at the Hellenic Social Club on both of the crucial nights. He was scheduled to testify for the prosecution, but before the trial began he told the government that he would not testify because he was afraid of being killed. Velentzas had been murdered by persons unknown and Renella had fled, perhaps because of fear for his own life. Chiampas was nevertheless subpoenaed to appear at trial and he did appear, but he refused to answer any questions though ordered twice to do so by the judge; he explained that he was afraid for his life. He was then excused and the government offered in evidence his grand jury transcript. The court admitted it, and it was read to the jury. In it Chiampas described the fight and also stated that the appellants had returned the next night and gone outside with Velentzas.

The appellants contend that the admission of the grand jury transcript into evidence violated both the Federal Rules of Evidence and the Sixth Amendment, since a transcript cannot be cross-examined. Rule 804(a)(2) of the Federal Rules of Evidence allows a hearsay statement to be admitted only (so far as is relevant here) if the declarant "persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so . . . ." The appellants contend that Chiampas' persistence was not adequately tested because the district judge did not threaten him with contempt. But Chiampas was accompanied by counsel who must have explained to him the possible consequences of failing to testify. And since Chiampas' testimony, as we are about to see, was not vital to the government's case, it would have been needless cruelty for the court to have put Chiampas to a choice between going to jail and running the risk of meeting Velentzas' fate.

But persistence of a witness in failing to testify is only a necessary and not a sufficient condition for admitting a hearsay statement. Since grand jury transcripts do not come within one of the specific hearsay exceptions in Rule 804, they are admissible if at all only under the stringent criteria of 804(b)(5), the catch-all provision, which requires, so far as is relevant here, both "circumstantial guarantees of trustworthiness" equivalent to those of hearsay statements within the specified exceptions and that the statement be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." We think these conditions were also satisfied, though the first more clearly than the second. Chiampas had testified before the grand jury under oath of course, and hence subject to being prosecuted if he perjured himself, but also, so far as appears, without having been pressured to testify. It is conceded that he was a disinterested witness—a mere bystander, with no axe to grind. And his testimony was corroborated at every point by the tape of the conversation, and on most points by testimony of eyewitnesses as well, including Scalise. The government stresses the corroboration but of course that undermines the second condition of admission, that the hearsay declaration be the most probative possible evidence. The government points out that

at the time Chiampas' transcript was offered in evidence there was no other direct evidence that the appellants had been present at the fight, though it could be readily inferred from the tape, and says this was an essential part of its case. It was not. The tape provided all the evidence the government needed to show extortion by the appellants.

But Rule 804 does not require that hearsay evidence be essential in order that it be admissible. It is enough that it is the most probative evidence reasonably available on a material issue in the case. It was material though not essential for the government to show that the appellants had beaten up Velentzas the night before the taped conversation; it was further evidence that the transaction discussed in the taped conversation was extortionate and not, as the appellants tried to show at the trial, a normal business transaction. And at the time that Chiampas' grand jury testimony was read into evidence the government had no other direct evidence that it was the appellants who together with Renella beat up Velentzas. It is true that later in the trial Scalise admitted his participation in the fight, but at the time Chiampas' testimony was introduced the government did not know that Scalise would so testify.

In these circumstances the introduction of the grand jury transcript complied with the requirements of Rule 804 as interpreted in *United States v. Carlson*, 547 F.2d 1346, 1354–55 (8th Cir. 1976), and even, we think, as more narrowly interpreted in *United States v. Thevis*, 665 F.2d 616, 629 (5th Cir. 1982). And it did not violate the confrontation clause of the Sixth Amendment. Any use of hearsay testimony denies the defendant an opportunity to confront a witness against him, unless the hearsay declarant is available to be cross-examined as Chiampas was not. But this court, following the influential plurality opinion in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), has been unwilling to hold that the admission of hearsay evidence is a per se violation of the confrontation clause of the Sixth Amendment. We deem

hearsay (constitutionally) admissible if the witness offering the hearsay testimony is subject to cross-examination and the circumstances under which the hearsay statement was made indicate that its content is probably true. E.g., *Davis v. Franzen*, 671 F.2d 1056, 1058 (7th Cir. 1982). The first requirement, the purpose of which is to assure that the content of the hearsay statement has been accurately reported, is inapplicable in a case such as the present one where a transcript of the statement is offered in evidence and the accuracy of the transcript is not challenged. The second requirement is applicable and satisfied; Chiampas' statement was made voluntarily and under oath and was corroborated by other, highly probative evidence. Its admission did not violate the Sixth Amendment. See *United States v. West*, 574 F.2d 1131, 1136–38 (4th Cir. 1978).

The appellants raise other procedural issues, relating to the sufficiency of the evidence and whether they should have been tried separately rather than together. These issues have no conceivable merit so we move on to the appellants' substantive contentions. The first is that the commerce requirement of the Hobbs Act was not satisfied in this case. The Act, 18 U.S.C. § 1951(a), applies to anyone who by any of the acts forbidden in the statute "in any way or degree obstructs, delays, or affects [interstate or foreign] commerce or the movement of any article or commodity in [interstate or foreign] commerce ...." The government argues that the payment of extortion by Velentzas to the appellants depleted or would have depleted the assets that Velentzas had for buying coffee, which was shipped to him from out of state. (It is not entirely clear whether he ever actually paid any money to the appellants, but the statute punishes the attempt along with the completed act, so it is enough if commerce would have been obstructed or affected by the payment that they demanded if it had been paid.) The appellants scoff at this proposition by pointing out that Velentzas' purchases of coffee for the Hellenic Social Club amounted to only about $68 a month, but the statutory language "in any ...

degree" suggests that it would not matter how little coffee Velentzas bought so long as it came from out of state and was affected to any extent by his having to pay extortion to the appellants.

■ True, the fact that such payment might by depleting Velentzas' assets have reduced his purchases of coffee does not prove that it would have had this effect. But this court is committed to the view that commerce, within the meaning of section 1951(a), "is affected when an enterprise, which . . . customarily purchases items in interstate commerce, has its assets depleted through extortion, thereby curtailing the victim's *potential* as a purchaser of such goods." *United States v. Elders*, 569 F.2d 1020, 1025 (7th Cir. 1978) (emphasis added). We quoted this language with approval just recently in *United States v. Mattson*, 671 F.2d 1020, 1024 (7th Cir. 1982), and it covers the present case. See also *United States v. DeMet*, 486 F.2d 816, 821–22 (7th Cir. 1973). Although we declined to apply the principle to the facts of *Mattson*, that was because the case involved the extortion of money from an individual rather than a business or other enterprise. It is true that individuals have assets just as businesses do, that the depletion of an individual's assets could affect interstate commerce by causing him to buy less of some good or service which he obtains from out of state, and that the extortion of $3000 from the victim in *Mattson* may have reduced his interstate purchases by more than the payment by Velentzas of $500 a month to the appellants would have reduced his purchases of coffee for the Hellenic Social Club. In general, however, though not in every case, businesses purchase on a larger scale than individuals. Hence extortion is likely to have a greater effect on interstate commerce when directed at businesses than at individuals. That is the pragmatic justification for drawing the line between individuals and businesses or other enterprises so far as applying the depletion-of-assets theory is concerned, and we adhere to that line and reject the appellants' argument.

■ The last issue in the case is whether there was an extension of credit within the meaning of 18 U.S.C. § 894, of which the appellants were also convicted. The statute punishes the use of extortion to collect or attempt to collect any extension of credit or to punish any person for the nonrepayment thereof. 18 U.S.C. §§ 894(a)(1) and (2). The government's argument that the statute is applicable to this case rests on the following colloquy (part of the taped conversation) between Velentzas and Boulahanis:

> V: . . . How much I owe you all together?
>
> B: You, you owe me five hundred, now, the 8th of the month. Right now I'm lettin' you go for three hundred, this past month that just passed.
>
> V: Oh, we're starting off with five hundred, now?
>
> B: No, next month.

The government argues that a reasonable jury could infer from this conversation that Velentzas owed the appellants $500 from last month but that the appellants were forgiving $200 of the debt and using extortion to collect the remaining $300. We are willing to accept this interpretation of the conversation but do not see how it shows an extension of credit. All it shows is that Velentzas had (in the view of the appellants, which they coerced Velentzas to accept) defaulted on a payment due the appellants. The extension of credit is a deliberate act by a creditor. It does not occur merely because a customer defaults. Section 894 does not make it a crime to use extortion to collect debts, but only to exact repayment of credit previously extended.

■ It is true that although the appellants and Renella evidently beat up Velentzas and smashed his furniture because he had not paid them on time, they did not collect the money due them until the next night, the night of the taped conversation. If the previous night they had given him additional time to pay, that would have been an agreement to defer payment of a debt, and such a deferral would be within the reach of section 894. See *United States v. Annerino*, 495 F.2d 1159, 1166 (7th Cir. 1974); *United States v. Horton*, 676 F.2d 1165, 1171 (7th Cir. 1982).

But there is no evidence of such an agreement, and if perhaps it can be inferred from the circumstances still we do not think the government met its burden of proof beyond a reasonable doubt. As mentioned, the theory of the extension of credit that the government actually pressed in this case was different, and untenable.

The appellants should therefore have been acquitted on the second count; and although their sentences on count two were made to run concurrently with those on count one, it is possible that the sentences on count one were influenced by the district judge's belief that the appellants had violated section 894 as well as section 1951. We do not mean to imply that the trial judge *must* reduce the sentence imposed. We merely remand to permit the trial judge to consider whether, under all of the information available to him including the presentence investigation report, the same or some lesser sentence should be imposed.

The appellants' convictions on count one are affirmed, their convictions on count two are reversed, and the case is remanded for entry of judgments of acquittal on count two and for resentencing on count one.

SO ORDERED.