UNITED STATES of America, Plaintiff,

v.

**Robert Neil GOODE, Defendant.**

**No. 90–CR–111J.**

United States District Court,
D. Utah, C.D.

Sept. 12, 1990.

David J. Schwendiman, Salt Lake City, Utah, for plaintiff.

Robert Van Sciver, Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION AND ORDER

JENKINS, Chief Judge.

After a trial on July 18 and 19, 1990, a jury convicted defendant Robert Neil Goode of one count, under 18 U.S.C. § 894(a)(1), of using extortionate means to collect an extension of credit. On July 25, 1990, Goode moved for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. The motion asserted, without elaboration, that "the prosecution offered no evidence that defendant collected or attempted to collect any extension of credit by extortionate means." The government filed a response, and the court heard argument on Goode's motion on August 27, 1990. Goode's counsel then filed a memorandum in support of the motion on September 4, 1990. The court has considered fully the parties' oral and written arguments and hereby denies Goode's motion for judgment of acquittal.

## I. BACKGROUND

Defendant Goode's conviction arises out of a bizarre series of events not entirely of his own making. At the time of the offense, Goode operated Audio Video Surveillance Systems, a surveillance and debt collection business located in Orem, Utah. In early 1990, Goode was retained by David Whitney to attempt to collect a substantial debt owed to Whitney by Lawrence Faulkner, Whitney's former business associate.

The debt arose out of a 1988 judgment entered in a Utah federal district court in favor of Whitney and against Faulkner.[1] Since its entry, and despite repeated efforts, Whitney had met with little success in collecting the judgment. Whitney offered Goode one-third of any collection Goode obtained from Faulkner.

At trial, the government introduced evidence that, in late April of 1990, Goode began to surveil and harass Faulkner in an attempt to collect the judgment. Government witnesses, including Faulkner himself, testified that Goode, using the pseudonym "Tony," placed a series of phone calls to Faulkner's residence, threatening to harm Faulkner and members of his family unless Faulkner paid Whitney.[2]

The backbone of the government's proof at trial was a phone call placed by Goode to Faulkner's residence during the afternoon of April 30. Before the call came in, Faulkner had contacted law enforcement authorities who were present during the phone conversation and who tape-recorded it.

Goode, who admits to having made the call, identified himself as "Tony" and, mostly at Faulkner's prodding and suggestion, told Faulkner, among other things, that "Tony" would "take your ass out pal."[3]

The government argues that the April 30 phone call constitutes extortionate means to collect an extension of credit. Defendant's motion for judgment of acquittal is founded upon two arguments: first, that the government failed to prove an "extension of credit" as that term is defined by 18 U.S.C. § 891(1); and second, that the government failed to prove the use of "extortionate means" as defined in 18 U.S.C. § 891(7). In reviewing defendant's motion, the court "views the evidence in the light most favorable to the government and then determine[s] whether there is substantial evidence from which a jury might properly find the accused guilty beyond a reasonable doubt." *United States v. White*, 673 F.2d 299, 301 (10th Cir.1982) (citations omitted).

1. The judgment was entered on June 6, 1988 in the amount of $474,391.55. The court in that case found that Faulkner, the alleged victim in this case, and his co-defendant Roberta Beverly "engaged in an intentional and willful scheme from the beginning to defraud [Whitney and other] plaintiffs." Findings of Fact and Conclusions of Law at 25, *Whitney, et al. v. Faulkner, et al.*, 85–NC–0086S (D.Utah June 6, 1988). The court elaborated on a string of fraudulent investment schemes into which Faulkner induced Whitney to put his money. The court found, among other things, that Faulkner convinced Whitney to put up capital for the formation of LDL Commercial Development. *Id.* at 4. Faulkner and Beverly then concealed from Whitney the fact that they were withdrawing from LDL "large sums of money … for their own use and benefit." *Id.* at 5. The court concluded that Faulkner concocted "self-serving" documents to support the fraudulent schemes and that, at every turn, Faulkner and Beverly "betrayed the trust of a friend [Whitney] and someone who trusted them." *Id.* at 25.

2. The government also attempted to prove that Goode had thrown two Molotov cocktails—one on the driveway at Faulkner's residence and the other under a Cadillac parked at Faulkner's place of business. Goode flatly denied any involvement in these incidents. In any event, the firebombings, which occurred on April 28, 1990, do not constitute "extortionate means to collect an extension of credit" because the government concedes that the extension of credit from Whitney to Faulkner did not take place until the next day, April 29.

3. Goode maintained throughout the trial that he was led on by Faulkner during the conversation and that Goode never actually threatened Faulkner or his family members. The jury apparently did not accept Goode's version. In addition to Goode's threat to "take your ass out pal," the April 30 phone call contained other key exchanges:

FAULKNER: I could only rake up $15,000.00 and I'm not gonna pay that son-of-a-bitch [Whitney] until I have an assurance that you're not gonna hurt me and my kids.
TONY: Well, you pay him or I will.

\* \* \* \* \* \*

FAULKNER: And the important thing is, I'm not gonna pay Dave until I have some assurance that you're not gonna screw around with my kids.
TONY: Well if ya, if, if, you don't pay him, you will have a problem. I guarantee it.
FAULKNER: What do ya want me to do? How do I know I'm not, how, how the hell do I know what security I have you're not gonna screw around with my kids?
TONY: You have all the security in the world. You pay Dave, I will go away. Don't pay Dave, and you got problems like you wouldn't believe. Plaintiff's Exhibit 7 at 2–4 (transcript of April 30, 1990 phone call).

## II.  EXTENSION OF CREDIT

Section 894(a)(1), the statute under which Goode was convicted, was aimed at the nefarious practice of shylocking.  Its language, however, is not so limited in scope.[4] It provides in unequivocal terms that: "Whoever knowingly participates in any way ... in the use of any extortionate means (1) to collect or attempt to collect any *extension of credit* ..." shall be guilty of an offense against the United States. 18 U.S.C. § 894(a)(1) (1988) (emphasis added).  In other words, anomalous as it may be, the statute does not criminalize the use of extortionate means to collect mere debts.  Under federal law, at least, extortionate means may not be used in collecting "extensions of credit," but extortionate collections of debt are not proscribed.  Thus, the government must establish in this case that Goode's April 30 phone call was extortionate not in reference to a mere debt or obligation but to an "extension of credit."

■  In section 891(1), Congress defined an extension of credit as follows:

To extend credit means to make or renew any loan, or *to enter into any agreement, tacit or express*, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

18 U.S.C. § 891(1) (1988) (emphasis added). The government concedes that this case does not involve the making or renewing of a loan.  As applied to this case, then, the plain language of the definition requires an agreement between creditor and debtor, either tacit or express, to defer repayment of an obligation.  Evidence of a mere debt, standing alone, is not enough to prove an "extension of credit."  *See United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982).  The *Boulahanis* court recognized this clear distinction when it held that "[s]ection 894 does not make it a crime to use extortion to collect debts, but only to exact repayment of *credit previously extended.*"  *Id.* (emphasis added).

The Tenth Circuit has yet to opine upon the specific question whether the term "extension of credit" includes a mere debt or whether it requires something more.[5] Therefore, in the absence of Tenth Circuit direction, this court adopts the Seventh Circuit's reasoning in *Boulahanis* in deciding this case.[6]  More crucially, this court expressly rejects the holdings of courts that have given section 891(1) an expansive reading.  *See, e.g., United States v. DiPasquale*, 740 F.2d 1282, 1288 (3rd Cir.

---

**4.**  Much of Goode's memorandum in support of his motion is devoted to the argument that section 894 does not criminalize the extortionate collection of a legitimate judgment debt.  That clearly is correct, but it misses the mark.  As explained below, section 894 does proscribe the extortionate collection of an "extension of credit."  Just as with any other debt, a judgment amount may be the subject of an extension of credit.  Indeed, section 894 covers all extensions of credit, regardless of how the underlying debt arose.  *See United States v. Briola*, 465 F.2d 1018, 1021 (10th Cir.1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973).  Here, the jury found that there was an extension of credit on the judgment debt.  Thus, Goode's argument that Congress did not intend section 894 to extend to the collection of judgment debts is unavailing because, in this case, there was more than a mere judgment debt.

**5.**  In *United States v. Briola*, 465 F.2d 1018 (10th Cir.1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973), the Tenth Circuit held that the term "extension of credit" embraces a debt which has come into being in connection with a bookmaking operation.  *Id.*

at 1021.  The court commented in passing that "[t]he term 'to extend credit' is broadly defined by the statute (18 U.S.C. § 891(1))," but the court was not presented—and thus did not address—the specific contention that the statute requires more than a mere debt.  *Id.*

**6.**  In relying upon *Boulahanis*, the court is aware that the case has not been universally accepted. The Third Circuit expressly rejected *Boulahanis*. *See United States v. DiPasquale*, 740 F.2d 1282, 1288 (3rd Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 1227, 84 L.Ed.2d 364 (1985) (claimed debt, even if fictitious, is an extension of credit).  Other circuits have distinguished *Boulahanis* on its facts.  *See United States v. Polizzi*, 801 F.2d 1543, 1557 (9th Cir.1986) (series of "no collateral" loans at ten percent constitutes an extension of credit); *United States v. McMahan*, 744 F.2d 647, 649–50 (8th Cir.1984) (accepting check as payment is an extension of credit); *United States v. Brinkman*, 739 F.2d 977, 983 n. 5 (4th Cir.1984) (deferred recovery on royalty payments is an extension of credit).

1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 1227, 84 L.Ed.2d 364 (1985); *United States v. Brinkman*, 739 F.2d 977, 983 (4th Cir.1984); *United States v. Andrino*, 501 F.2d 1373, 1377 (9th Cir.1974). These courts suggest that Congress intended that the extortion statutes "be wielded with 'vigor and imagination.'" *DiPasquale*, 740 F.2d at 1288 (quoting Conf.Rep. No. 1397, 90th Cong., 2d Sess. 31, *reprinted in* 1968 U.S.Code Cong. & Admin.News 1962, 2029). The *DiPasquale* court went on to hold that "an agreement to defer the repayment of a debt may be implied from the debt." *Id.* at 1287. In effect, then, *DiPasquale* reads sections 891 and 894 to proscribe the extortionate collection of mere debts.[7]

This court is unwilling to read more into the plain language of section 891(1) than is there. Indeed, the court adheres to the time-honored maxim that criminal statutes should be strictly construed and that ambiguities concerning the ambit of criminal statutes should be resolved in favor of lenity. *See United States v. Sparrow*, 635 F.2d 794, 796 (10th Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 209 (1981) (quoting *United States v. Enmons*, 410 U.S. 396, 411, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973)). Only then can potential defendants know what conduct is and is not proscribed by federal law. When an accused is held to account for allegedly criminal acts, there can be no room for vagueness and ambiguity, nor can

there be room for "vigor," "imagination," or any other form of haphazard statutory construction. Here, section 891(1) expressly defines the term "extension of credit." Part of that definition applicable to this case requires an "agreement, tacit or express" to defer repayment. Given that plain language, this court will require evidence of such an agreement and will not treat as an extension of credit something less than is statutorily prescribed.

■ Thus, as applied to this case, an extension of credit must consist of an agreement—either tacit or express—to defer repayment of all or part of the judgment entered against Faulkner. Further, that agreement must have been between Whitney, the judgment creditor, and Faulkner, the judgment debtor. Only Whitney could agree to defer repayment of a judgment amount owed to him. Goode could not agree tacitly or expressly to a deferral unless given that authority by Whitney.

The government argues that the agreement to defer repayment was reached during a phone call between Whitney and Faulkner on April 29—one day before Goode's threatening phone call. As support for its position, the government points to evidence that, of the approximate one-half million dollars owed on the judgment, Whitney agreed to accept $50,000.00 from Faulkner immediately, with installment payments of $1,000.00 to follow.[8] The evi-

---

7. Even a cursory reading of *DiPasquale* reveals that the court all but read the term "agreement" out of section 891(1). The court held that:

> [U]nder section 891(1), an agreement to defer the repayment of a debt may be implied from the debt, even if the debt is wholly fictitious. When a self-styled creditor appears before his "debtor" and demands satisfaction, the creditor posits both a debt and the prior deferral of its repayment.

*DiPasquale*, 740 F.2d at 1287. Such reasoning may be a useful proposal for legislative amendment. Congress, at some future date, may elect to criminalize extortionate collection of mere debts. But such reasoning completely ignores section 891(1) as it exists. An extension of credit, as currently defined, plainly requires an "agreement, tacit or express."

The *DiPasquale* court suggested that, "[o]nly the *Boulahanis* court has constrained the scope of [the extortion statutes]." *Id.* at 1288. If that

is true, then this court makes a duet out of the chorus of constrainers.

8. The conversation between Whitney and Faulkner on April 29 was recorded and transcribed. At trial, the government used the transcript of the Whitney–Faulkner conversation to cross-examine Whitney. When asked about this conversation, Whitney testified as follows:

> Q. All right. Do you recall, also him telling you, I can't come up, or I couldn't come up with the full 50?
> A. Yes.
> Q. And you telling him, well, now, it's supposed to be the full 50. I'll try to help you out if it's 50, but if not, I don't know. It depends on when it is. I'll take a look at it tomorrow. I'll call you tomorrow morning, we'll talk about it.
> A. Okay.
> Q. *That's got to do with accepting what he could get you, and deferring the rest until he had more.*

dence introduced at trial supports the government's contention, and the jury found that this agreement, albeit tacit, constituted an extension of credit pursuant to section 891(1). That finding is supported by substantial evidence. By agreeing to accept $50,000.00 immediately, Whitney tacitly agreed to defer repayment of the balance. The judgment until that time was a mere debt. Upon Whitney's agreement to accept $50,000.00, or some lesser amount, and defer the rest, the debt became an extension of credit for purposes of sections 891(1) and 894. *Cf. Boulahanis*, 677 F.2d at 590 (if creditor gave debtor "additional time to pay, ... such a deferral would be within the reach of section 894"). Thus, when Goode placed the April 30 phone call to Faulkner, there was an existing extension of credit.

## III. EXTORTIONATE MEANS

■ Goode's second argument in support of his motion appears to be that the government failed to establish his use of "extortionate means." [9] This argument is without merit. The government presented evidence sufficient for the jury to conclude that Goode used extortionate means in attempting to collect an extension of credit.

Section 891(7) defines "extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7) (1988). The court used this statutory definition in instructing the jury concerning the meaning of the term "extortionate means." *See* Jury Instruction No. 22. The government relied upon Goode's April 30 phone call as evidence of threats of violence to Faulkner and his family. The jury heard the tape-recorded phone call as well as evidence concerning background, context, and meaning. Goode was given opportunities, both on direct and cross-examination, to explain the phone call. The phone call contained Goode's direct remark to Faulkner that "Tony" would "take your ass out pal." Goode also uttered other statements which the jury could have construed as threats to Faulkner's person, reputation, or property. *See supra* n. 3. And as noted above, there was an existing extension of credit between Whitney and Faulkner when Goode placed the April 30 call.[10]

Viewing all of the evidence, as it must, in the light most favorable to the government, the court finds that there is substan-

---

A. *Sure.*

\*   \*   \*   \*   \*   \*

Q. And that also has to do with this making a payment, and then getting what you could, down the road.

A. Yeah. Yes.

Q. And just a couple more: If you'll look on page six, at the very bottom: Do you recall saying to Mr. Faulkner: I'll keep track of all your payments and when you're paid, I'll call you.

A. Yeah, sure. I was under the impression that I was going to get $50,000, and a thousand dollars a week thereafter. Trial Transcript, July 19, 1990, at 28–29 (emphasis added).

9. Goode's memorandum in support of the motion argues that the government has not proved "extortion within the meaning of 18 U.S.C. § 891(6)." This citation is misplaced. Section 891(6) defines the term "extortionate extension of credit." Goode, however, was not charged with making an extortionate extension of credit. An extortionate extension of credit is an offense separate from section 894; it is made criminal under 18 U.S.C. § 892. The government did not charge Goode under section 892, nor was any evidence at trial directed toward proving such

an offense. Thus, the court can only guess that Goode is arguing that there was insufficient evidence of his use of "extortionate means" as contained in sections 891(7) and 894.

10. The government also presented evidence to support an inference that Goode was aware of the extension of credit when he placed the April 30 phone call. Goode placed the threatening call to Faulkner on the afternoon of April 30. Goode's former employer, Gary Sorrells, testified that he met with Goode around 11:00 p.m. on April 30. At that meeting, Sorrells testified that Goode told him about the Faulkner account. Specifically, Sorrells indicated that Goode said that "he collected [from Faulkner] an initial fee of I believe $50,000 and was able to get $1,000 a week thereafter." Trial Transcript, July 18, 1990, at 12. In other words, the evidence suggests that Goode was aware of the Whitney–Faulkner extension of credit just hours following his afternoon call to Faulkner. That evidence supports at least an inference that Goode was aware of the extension of credit at the time he placed the call to Faulkner.

tial evidence supporting the jury's finding that Goode employed "means which involve[ ] the ... express or implicit threat of use, of violence ... to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7) (1988). The court will not disturb the jury's determination with respect to Goode's use of extortionate means.

## IV. CONCLUSION

Based upon the foregoing analysis and the evidence presented at trial, the court hereby DENIES defendant Robert Neil Goode's motion for judgment of acquittal.

IT IS SO ORDERED.